In re VISCOUNT AIR SERVICES, INC., Debtor.

Viscount Air Services, Inc., Debtor (through Randall P. Sanders, Trustee), Plaintiff,

v.

Walter L. Cole and Dennese P. Cole, husband and wife; Ronald J. Clark; 9 Lives Holdings, Inc., a Nevada corporation, Turbo Aire Holdings, Inc., a Nevada corporation, and BAE Aviation, Inc., d/b/a/ Tucson Aerospace, an Arizona corporation, Defendants.

Bankruptcy No. B–96–0209 TUC JMM. Adversary No. A 96–0131 JMM.

United States Bankruptcy Court, D. Arizona.

Oct. 28, 1998.

Susan Boswell, Nancy March, Streich Lang, Tucson, AZ, for plaintiff.

Gary S. Kessler, Howard C. Rubin, Malouf, Lynch, Jackson, Kessler & Collins, Dallas, TX, for 9 Lives Holdings.

Edward S. Coleman, Las Vegas, NV, for Clark and Cole.

Timothy H. Barnes, Barnes & Lassiter, P.C., Mesa, AZ, for Turbo Aire and BAE Aviation.

Michael McGrath, Mesch, Clark & Rothschild, P.C., Tucson, AZ, for debtor.

## MEMORANDUM DECISION

JAMES M. MARLAR, Bankruptcy Judge.

The court held a 15-day trial in this matter between May 4, 1998 and May 27, 1998. Thereafter, the parties submitted additional evidence on July 27, 1998. Susan G. Boswell, Steven R. Haydon and Nancy J. March represented Randall P. Sanders, Trustee; Timothy H. Barnes represented Turbo Aire Holdings, Inc. and BAE Aviation, Inc., dba Tucson Aerospace; Edward S. Coleman represented Walter and Dennese Cole and Ronald J. Clark; Howard Rubin and Gary S. Kessler represented 9 Lives Holdings, Inc. The court has considered the evidence, the law, the legal memoranda, and the exhibits, and now issues its Memorandum Decision. In doing so, it notes that it listened to and reviewed the testimony of 17 live witnesses(15 actual; 2 by read deposition), reviewed 478 documents admitted in evidence, and read portions of 13 depositions designated by the parties. After post-trial briefing concluded on October 2, 1998, the court took the matter under advisement. Between the close of evidence on July 27, 1998 and the date of this opinion, the court has been independently reviewing all of the evidence, and analyzing the legal principles involved. The facts set forth in this memorandum, as well as the legal conclusions, were requested by the parties and constitute the court's findings of fact and conclusions of law. *F.R.Civ.P.* 52(a); *Bankr.R.P.* 7052.

## INTRODUCTION

This debtor a filed voluntary chapter 11 case on January 24, 1996. It operated as a charter non-scheduled air carrier serving sports, entertainment and casino groups. Two years before, at its pinnacle in April, 1994, it was operating 13 aircraft (NLH–273). Two years and six months after its peak, on approximately October 28, 1996, the debtor became unable to operate further in chapter 11, ceased operations, returned its leased aircraft, and began the process of an orderly liquidation (SF No. 25). A trustee, Randall P. Sanders, was appointed on January 29, 1997. Mr. Sanders is the successor plaintiff, who acts on behalf of the creditors of Viscount's estate.

The instant litigation commenced on August 29, 1996. Simplified, the Complaint seeks the return of two aircraft and related property, as well as money damages, arising out of claimed fraudulent conveyances and the theft of a corporate opportunity. The trustee also seeks the return of preference or post-petition payments from Turbo Aire Holdings, Inc. and BAE Aviation (dba Tucson Aerospace). Finally, the trustee seeks an award of damages against Messrs. Clark and Cole, jointly and severally, for "breach of fiduciary duties" which allegedly occurred pre-petition.

In this decision, the letter "P" refers to a plaintiff's trial exhibit, and "NLH" refers to a 9 Lives trial exhibit.

## JURISDICTION

This court has jurisdiction pursuant to 28 *U.S.C.* §§ 157; 1334. This is a core proceeding. 28 *U.S.C.* § 157(b)(A), (E), (F), (H) and (O). Requests for trial by jury were denied.

## MOTION FOR INVOLUNTARY DISMISSAL (Directed Verdict)

At the conclusion of plaintiff's case, all defendants moved for directed verdict, pursuant to *F.R.Civ.P.* 41. The court took the matter under advisement. After reviewing the evidence, the court now rules. The Motions are DENIED.

## THE DEBTOR AND ITS AFFILIATES

In order to best understand the workings of VASI [1], it is of great assistance to understand the interrelationship of the affiliated entities. In summary, those relationships are:

***Viscount Air Services, Inc. ("VASI" or "Viscount")***— The debtor in this chapter 11 case. It was the principal operating entity, running a charter airline business. Walter and Dennese Cole hold 100% of the stock. (P. 433). Prior to June 29, 1994, Ronald J. Clark had a right to acquire a fifty percent (50%) beneficial interest in the stock of Viscount owned by Cole (SF). That right has never been exercised.

***Turbo Aire Holdings, Inc. ("TAHI" or "Turbo Aire")***— This entity owns the real estate at 1000 E. Valencia, Tucson, Arizona, adjacent to the Tucson Airport. It leased office and work space to VASI and to Tucson Aerospace. Cole and Clark each own 50% of the stock in this entity (P. 433).

***BAE Aviation, Inc., d/b/a Tucson Aerospace ("BAE" or "Tucson Aerospace")*** — This entity was an FAA-certified repair station for aircraft. Approximately 90% of its business was generated by VASI (SF). Its stock was owned 100% by TAHI (P. 433). Tucson Aerospace ceased operations sometime in 1996(SF).

***9 Lives Holdings, Inc., ("NLH" or "9 Lives")***— Through 1993, 9 Lives was an inactive company, with no income or assets (P. 314; Richardson depo. at 70–71; Gho-

man depo. at 144–145). It reactivated its business on May 10, 1994 (Clark depo. at 26). Prior to May 10, 1994, 9 Lives held title to no assets (Cole depo. at 117; see, also Ghoman depo. at 58 ("Mar. or April 1994")). Its stock is held 50% by Clark, through his company Wolfjet, and 50% by Cole, through the Cole Family Trust (P. 766). Its officers are Clark and Cole (P. 766).

***Viscount Air Tours, Inc. ("VATI")***— This entity, formed by Clark in approximately 1994, and of which he owns 100% of the shares, operated tours. VATI conducted business, under the name "Best Deal Vacations" (P. 578). VATI entered into a contract with Viscount to provide charter flight services for tours arranged by VATI. At various times during the business relationship between VATI and Viscount, disputes arose regarding the relationship, the service provided, and the amounts each owed to the other. (P. 21, 169, 263, 262, 563.) According to Michael Coward, VATI ceased operations in mid–1995.

Thus, until financial difficulties began to beset (or perhaps to catch up with) the VASI family, it appeared to have been a well-organized operation, with an integrated physical plant, repair station, and an operating passenger airline all located at one principal location in Tucson, Arizona.

## FACTS

### A. VASI's Operating History

Viscount was formed in 1985 by Walter Cole as an operator of charter air flights. Viscount was incorporated as a California corporation and later moved its offices to Tucson, Arizona. Since its inception. Viscount has been a California corporation (SF). At and since the time that Viscount was formed. Walter Cole and his wife, Dennese Cole (collectively "Cole"), have

1. "VASI" refers to the debtor, Viscount Air Services, Inc. "SF" refers to facts stipulated to by the parties contained in the Joint Pre-

trial Statement. VASI will also be referred to, interchangeably, as "Viscount."

owned 100% of Viscount's stock (SF). At approximately the same time that Viscount was incorporated, Ronald Clark joined Viscount in order to help it obtain an operating certificate from the Federal Aviation Administration ("FAA") and to perform marketing and other functions for Viscount. In 1985, Clark became Viscount's sales director (SF). Viscount was a charter passenger carrier, concentrating on sports teams, entertainment groups, and casino charters (P. 433).

On or about April 15, 1990, Viscount entered into a lease with Turbo Aire ("TAHI") wherein Viscount agreed to lease a portion of the Valencia Property for a monthly rent of $5,000.00. The lease was for a period of three years, until April 30, 1993. After the lease expired in July 1993, Viscount and Turbo Aire entered into a new, five-year lease for a portion of the Valencia property (SF). The monthly rent was raised to $15,000.

In 1992, Viscount applied for and obtained a Part 121 certificate from the FAA, which allowed it to operate large jet aircraft as a holder of a DOT Section 401 Certificate of Public Convenience and Necessity (an air carrier) and a charter (supplemental) airline (SF).

On October 12, 1993, Viscount entered into a lease with First Security Bank of Utah (FSBU) (the "308 Lease") pursuant to which Viscount leased a Boeing 737-247 aircraft bearing manufacturer's serial number 19613 and Registration Number N4516W (later designated N308VA) and its associated engines, equipment, spares and plane documents (the "308") (SF).

On April 13, 1994, Viscount entered into another lease with FSBU (the "4501 Lease") pursuant to which Viscount leased another Boeing 737-247 airplane, bearing manufacturer's serial number 19598 and Registration Number N4501W, including two engines, certain installed equipment, spares and plane documents (the "4501") (SF).

Both the 308 and the 4501 aircraft were leased to Viscount in "as is/where is" condition. Being older aircraft, built in the mid-60's, they could be leased at low market rates. There were also certain improvements and repairs which were needed to comply with FAA Airworthiness Directives, due to the age and condition of the planes. The agreements provided that Viscount would be responsible for performing certain necessary repairs and improvements in order to make those aircraft airworthy and to comply with FAA requirements (SF). Viscount performed and paid for the necessary repairs to make the 308 and the 4501 airworthy and to comply with FAA directives (SF). These aircraft were beneficially owned by separate, individual partnerships managed by Polaris Aircraft Leasing Corporation ("Polaris"). FSBU, in turn, managed the aircraft as a trustee for Polaris, handling the necessary documentation. However, all of the financial decisions concerning the Polaris-leased planes were made by Polaris. Polaris was diligent in inspecting the planes and monitoring the financial affairs of VASI. Sometime in 1994, Polaris merged into and became a part of General Electric Aviation Services (GECAS), itself a subsidiary of the General Electric Company (SF). For purposes of this discussion, "Polaris" and "GECAS" will be used interchangeably.

Although the leases ultimately named VASI as the lessee, preliminary discussions with GECAS in August 1993 assumed that 9 Lives would be the lessee (NLH Exhibits 9, 10, 11, 12, 13, 14, 16, 17, 19). Even James W. Linnan, Polaris' Director of Marketing and manager of its investor services arm, testified that almost from the outset ("Day One"), he expected that 9 Lives would be the lessee. However, when the leases were finally executed, VASI was the named lessee and 9 Lives was nowhere mentioned in the documents (P. 342). The lease of the 308 737-200 aircraft was executed October 12, 1993 (P. 11, 342, 346, 347; NLH-21, 22). VASI obtained a $250,000 letter of credit as an

insurance condition of the lease. (NLH–81, 82; P. 293, 456). VASI's Board later ratified amendments to the GECAS lease (NLH–274). In GECAS' estimation, VASI was a "low utilization" carrier with its own repair facility (BAE). This made it an attractive lessee for GECAS' older model planes.

The lease of the 4501 was discussed in early spring, 1994 (P. 406; NLH Exhibits 23, 24, 26, 27, 28, 29, 30 and 31), and drafts indicated, again, that the initial proposed lessee was to be 9 Lives. However, when the lease of the 4501 was actually signed and closed on April 13, 1994, VASI was the named lessee and, once again, 9 Lives was not a party to the contract (P. 386, 387). The 4501 was also a 737–200 plane, in a "non-advanced" stage, meaning that it too needed improvements.

The leases were referred to by GECAS and Viscount as "finance leases," because they contained option exercise dates and options to purchase amounts as follows:

### The 308 Lease

| December 31, 1993 | $900,000.00 |
| June 1, 1994 | $800,000.00 |
| December 31, 1994 | $700,000.00 |
| June 1, 1995 | $600,000.00 |
| December 1, 1995 | $400,000.00 |
| June 1, 1996 | $200,000.00 |
| December 1, 1996 | $ 1,000.00 |

[The option was exercised on December 29, 1994 for $700,000.]

### The 4501 Lease

The purchase option under the 4501 Lease, at the end of the lease term on October 12, 1996, was 500,000.00 (SF).

[However, the option was exercised earlier, on November 22, 1995, for $834,000.]

Each lease also required Viscount to pay GECAS monies which were designated as "maintenance reserves." These were deposits for anticipated future repairs based on the number of hours or "cycles" (which means one takeoff and one landing) the planes were flown (SF). According to the leases, these maintenance reserves, paid in by Viscount, were to be held by GECAS and would be reimbursed to VASI when specific types of maintenance on the 308 or the 4501 was actually performed (SF). The leases also required Viscount to pay a $25,000 security deposit on each aircraft, which VASI paid (SF).

Earlier, in the fall of 1993, David C. Bernstein ("Bernstein") entered the picture (SF), Bernstein was a principal in several closely-held businesses related to the transportation of cargo and freight. He had known Ronald Clark since the late 1970's. One of his principal ventures was a corporation known as Rock–It Cargo, Inc. ("Rock–It"). By his own testimony, Bernstein admitted that he was infatuated with the allure of a passenger airline, and he approached Clark and Cole about acquiring a controlling interest in VASI. Discussions progressed through April 20, 1994, when Bernstein signed a letter agreement for his acquisition of VASI's stock (SF). After an initial six-week due diligence period by Rock–It financial personnel during January and February, 1994, an agreement was signed on June 29, 1994(SF). Andrew Dietz, a member of the due diligence team, recommended that Bernstein not purchase VASI. Bernstein proceeded anyway.

However, on May 10, 1994, prior to the final agreement being signed with Bernstein. Viscount assigned its interests in the 308 and 4501 leases to 9 Lives pursuant to an "Agreement For Assignment Of Aircraft Lease" (SF). These Lease Assignments stated that the consideration for the assignment of the Leases was: (1) relieving Viscount's obligations to GECAS under the Leases, and (2) 9 Lives' guarantee of certain Viscount obligations to Turbo Aire (SF). Bernstein testified that he was aware of those negotiations, and that the transfer of the 308 and 4501 aircraft to 9 Lives was "OK" with him. Bernstein noted that he did not participate in these transactions, and that he was "not aware of any benefit" to VASI.

Both of the leases either required the consent of GECAS to any transfer or sublease, or prohibited it. (P. 11, 386, NLH–21 Sec. 6(a)). According to Linnan, GE-CAS was never advised—contemporaneously—of the VASI assignment of the leases to 9 Lives. Nor did GECAS ever consent to the assignments in writing, and VASI was never released from its lease obligations. (Clark depo. at 166–167; Cole depo. at 241–242). VASI was always regarded as the party which was liable to GECAS. The VASI assignment of both planes to 9 Lives, on May 10, 1994, was unknown to GECAS.

Concurrent with the Lease Assignments, on May 10, 1994, 9 Lives *then subleased back* the 308 and the 4501 to Viscount pursuant to the "9 Lives Holdings, Inc. Sublease Of Aircraft To Viscount Air Services, Inc." (SF). The Sublease Agreement provided for a monthly rental of the aircraft for $40,000.00 per month each (SF). In turn, the Polaris leases each called for a $35,000 per month rent for each plane. Thus, NLH received a net monthly income of $10,000 for the two planes. The Sublease Agreements also required VASI to continue paying the maintenance reserves and other costs associated with the 308 and the 4501(SF).

On June 29, 1994, Bernstein contracted to acquire a 65% interest in VASI (P. 137). He then contributed or lent two of his own 737 aircraft to VASI, increasing its fleet (P. 418). Bernstein became a director of VASI, but the operational and sales aspects remained with Cole and Clark, respectively, who also remained directors of the company. Both Cole and Clark were to each be paid salaries of $240,000 per year, with a "perk" allowance of $40,000 annually, each (P. 137, para. 9.4). Bernstein was to receive equivalent benefits.

During this same period, in the first quarter of 1994, VASI asked GECAS to defer certain lease and maintenance re-serve payments to GECAS (SF), because a condition of Bernstein's anticipated purchase of a portion of the stock of Viscount was the agreement of GECAS for a deferral of at least $2.5 million in lease payments (SF). GECAS showed interest in the proposal (P. 420), and over the next few months, various proposals were discussed. (P. 329, 377, 417, 420). Bernstein believed the new financing, and deferrals, together with Rock–It loans, would "realistically cover" the necessary capital to keep VASI operational.

On July 20, 1994, the restructured GE-CAS agreement materialized, and VASI executed a Loan and Restructuring Agreement with GECAS (SF; P. 366). A condition to GECAS' willingness to enter into the Loan and Restructuring Agreement was not only Bernstein's investment in Viscount, but also a guaranty of the obligations created by the Loan and Restructuring Agreement by Bernstein and all of his related or affiliated companies (SF). Because of Bernstein's anticipated financial stability, GECAS believed that VASI's financial outlook was enhanced. (NLH–105; P. 418). Although GECAS was given an option to acquire 15% of the VASI stock, it was never exercised. According to James Linnan, GECAS felt that this restructuring would get VASI "over the hump" in order to become profitable, and thereby become a potential lessee or buyer for even more GECAS planes.

However, once Bernstein acquired his interest, VASI began to deteriorate. Immediately, disagreements between Cole and Clark on one side, and Bernstein on the other, began to take shape, concerning, among other things, personnel, strategy and the amount of liabilities which VASI had represented that it had. With regard to the latter, Bernstein demanded a $750,-000 credit on the purchase price, pursuant to the Stock Purchase Agreement.[2] (See, e.g., P. 12, Sec. 6.10; 137, 566). In early

2. Under the Stock Purchase Agreement, the parties had agreed that if VASI's liabilities exceeded $2.5 million, then Bernstein would receive a dollar-for-dollar credit, up to a maximum additional credit of $750,000. (Depo. of Andrew Dietz, at 92; 98).

October 1994. Rock–It Cargo made the first of many "loans" (or capital contributions) since Bernstein's involvement in order to shore up VASI's ailing cash flow (P. 25)[3]. That loan was in the amount of $250,000 (P. 25). Bernstein advised Clark and Cole that the cash flow was "suffering," and agreed to lend up to $4.5 million in return for a Clark/Cole guarantee (P. 555).

In July 1994, another financial setback occurred when National Bank of Arizona advised VASI that its $250,000 line of credit would not be renewed when it expired on October 7, 1994 (SF; p. 365). This letter of credit had been necessary (or it was to have been replaced with an actual, additional deposit) in order to properly insure the GECAS-leased airplanes. The expired letter of credit was replaced on October 19, 1994, when Rock–It placed its own credit on the line with First Los Angeles Bank and obtained a new letter of credit, thereby shoring up GECAS' insurance deductible requirement (P. 364). On October 20, 1994, VASI executed a promissory note to Rock–It for $250,000 in order to give Rock–It some comfort for this credit extension (P. 26).

These spiraling financial setbacks and disagreements culminated on October 12, 1994, when Bernstein paid $1,034,855 to increase his total paid ownership of Viscount's shares from 35% to 51%, pursuant to an amendment of the Stock Purchase Agreement (SF). On October 12, 1994, Clark and Cole resigned as directors of VASI (P. 158, 159). Clark retained his substantial salary and perks, while Cole cut back to only $40,000. Earlier, in August 1994, Bernstein had been elected Chief Operating Officer, and other people favorable to Bernstein had also become officers (P. 380). On October 12, 1994, the Stock Purchase Agreement was modified, continuing Clark's $280,000 annual salary and "perks," but reducing Cole's entitle-

ment to $40,000 per year (P. 181). Bernstein remained as VASI's sole director.

Now Bernstein was essentially on his own. Between October 20 and December 31, 1994. Rock–It lent VASI an additional $1,571,492 (P. 26, 27, 28, 29, 30, 31, 32) in order to shore up its flagging sources and to keep VASI operational. Bernstein testified that VASI was continuously suffering a "liquidity crunch," and was "not able to pay all its creditors." While VASI had sufficient capital to continue operating, its ability to do so required ongoing, substantial borrowing from other Bernstein businesses (P. 223).

Into 1995 staggered VASI, with Bernstein at the controls of the fast-diving company. In February, Bernstein noted that "VASI's financial controls are between weak and non-existent" and that "VASI will not survive with costs out of control" (NLH–190). At the end of February 1995, one of VASI's planes was seized in Daytona Beach. Florida for non-payment of landing fees, and VASI's inventory locator system was shut down because of unpaid bills (NLH–209). And, as Bernstein testified, between March and May 1995, VASI's financial condition did not materially improve.

As VASI became delinquent on its rental payments to 9 Lives on both the 308 and 4501 airplanes. Clark and Cole became more upset, demanding payment, refusing rent concessions, and threatening legal action for alleged libelous and slanderous statements being made by the Bernstein organization (P. 223, 284, 564; NLH–89).

From January 1–May 22, 1995, VASI continued its substantial borrowing from the Bernstein entities, obtaining $705,000 in additional loans (P. 33, 34, 35, 36, 37, 38, 39). By February, Bernstein admitted that morale in the accounting department was "bad," and that VASI was having diffi-

---

**3.** Rock–It, before Bernstein's formal involvement, lent $350,000 during the "courtship" period, on April 22, 1994 (P. 24).

culty accurately reporting profits and losses.

During this turbulent period, GECAS proposed to restructure its leases and other obligations (P. 65.428, 429, 438), and VASI was required to pay GECAS on a *daily* basis. Clark and Cole then advised Bernstein that they would allow VASI to accept the GECAS proposal, provided that they were placed back into active management, that operations be returned from Salt Lake City to Tucson, and that they not be "punished for the company's financial performance" (P. 429, 498).

On May 22, 1995, Bernstein agreed that Clark and Cole were to be re-elected to the board of directors of Viscount, and that they resume day-to-day management and control of Viscount pursuant to certain agreements between and among Viscount, Bernstein, Clark and Cole as evidenced by a "Modification of Stock Purchase Agreement Executed on June 29, 1994, and Amendment to Stock Purchase Agreement Executed on October 12, 1994," which was modified and supplemented during the early summer of 1995 (SF; p. 498). Among other things, this agreement placed Cole and Clark once more in charge of running the company (P. 498). At this point, Bernstein testified that he was "burnt out and looking for help" in "unifying management." Cole again was placed in charge of operations, and Clark in charge of administration and sales.

But within a month things deteriorated. On June 19, 1995, Edward S. Coleman, the attorney for Clark and Cole, advised Bernstein that VASI was now "operating profitably," was producing "positive cash flow," and that GECAS leases were "current" (P. 283). Bernstein immediately disputed these conclusory statements, revoking the Cole proxy and demanding, in exchange for $200,000 which he then tendered to Coleman, that 160 shares of the Clark/Cole stock be delivered to him (P. 545). Clark and Cole, however, claimed that Bernstein was not entitled to the stock, and inflamed the situation by choosing words like "fraud" and "conspiracy" in responding to Bernstein's demands. For the first time, chapter 11 was mentioned. Bernstein fought back, and on July 21, 1995, Rock–It Cargo made demand on VASI for repayment of notes held by it totalling $2,463,-745.48 (P. 282). Clark and Cole then sought to arrive at an amicable resolution, lest "anything less will become a lawyer's and accountant's dream." a remark which has since proven prophetic (P. 543, 544, 545, 546).

In late July 1995, cooler heads prevailed, and the stock proxy dispute was resolved (P. 499, 500, 501). Clark and Cole accepted $200,000 from non-VASI entities; control of the stock passed to Bernstein; Clark, Cole and Bernstein constituted the VASI Board of Directors; and chapter 11 was agreed not to be filed without 100% board approval. From July–December, 1995, attorney Bruce McCaslin was hired by VASI to assist it in managing its creditor problems (McCaslin depo. at 15–16).

Things temporarily improved. In August 1995, GECAS again broached the subject of a new loan restructuring program (NLH–156; p. 408), and Bernstein reported to the accounting firm of Deloitte and Touche that VASI's financial difficulties were improving (NLH–126). During this period, lease payments to GECAS on the fleet continued to be made on a daily basis.

But lasting peace was not to be. On November 10, 1995, 9 Lives declared a monetary default and cancelled VASI's lease on the 308 aircraft (NLH–312). On November 29, 1995, GECAS was troubled by at least one default of $55,000 on daily payments (P. 389). In December, VASI borrowed another $272,500 from Rock–It for operating capital (P. 40, 41, 42, 43); Cole and Clark resigned from the Board on December 6, 1995 (SF; P. 198, 200), and transferred the last 35% of their stock to Bernstein (SF; P. 138); and 9 Lives dunned VASI for two missed payments, then terminated the lease on the 4501 air-

craft (NLH–138; P. 160). By the end of the month. VASI noted that it had $5,252,337 in outstanding major accounts payable (P. 778). According to Bernstein, during November and December, 1996, VASI's ability to acquire outside capital was "limited."

On January 24, 1996, VASI filed for chapter 11 protection (P. 767).

### B. VASI's Historical Financial Condition

At various times, VASI produced internal financial statements. Throughout this case, both witness testimony and documentation suggested that VASI's financial records were incomplete and sloppily maintained. Yet, VASI internally produced most of the documents presented here, and it seems ironic that those once in control would now suggest that such documents present less than an accurate picture. Therefore, because such exhibits are, essentially, the only contemporaneous evidence of VASI's financial condition over time, they will be accepted by the court and considered as evidence of VASI's true financial condition. That condition was:

| DATE | EXHIBIT | ASSETS | LIABILITIES | NET WORTH | S/I [4] |
|------|---------|--------|-------------|-----------|---------|
| 6–30–93 | P. 434 | 1,789,640 | 485,656 | 1,303,984 | S |
| 6–30–93 | P. 246 | 1,789,640 | 487,656 | 1,301,984 | S |
| 7–31–93 | P. 584 | 1,088,500 | 1,606,368 | (517,868) | I |
| 8–31–93 | P. 585 | 1,219,370 | 1,847,974 | (628,604) | I |
| 9–30–93 | P. 586 | 1,768,426 | 2,068,650 | (300,224) | I |
| 10–31–93 | P. 587 | 2,352,233 | 2,481,784 | (129,551) | I |
| 11–30–93 | P. 588 | 2,271,698 | 2,751,217 | (479,519) | I |
| 12–31–93 | P. 589 | 4,284,570 | 5,621,340 | (1,336,770) | I |
| 1–31–94 | P. 590 | 3,942,500 | 5,089,219 | (1,146,719) | I |
| 2–28–94 | P. 591 | 4,385,966 | 5,830,115 | (1,444,149) | I |
| 3–31–94 | P. 592 | 5,246,337 | 6,533,685 | (1,287,348) | I |
| 4–30–94 | P. 593 | 7,037,323 | 9,119,616 | (2,082,293) | I |
| 4–30–94 | NLH–329 | 8,530,452 | 7,948,124 | 582,328 | S |
| 5–31–94 | P. 594 | 7,635,756 | 10,785,565 | (3,149,809) | I |
| 5–31–94 | NLH–330 | 8,924,818 | 9,761,504 | (836,686) | I |
| 6–30–94 | NLH–239 | 5,143,206 | 6,701,353 | (1,558,147) | I |
| 6–30–94 | NLH–184 (accrual) | 7,679,538 | 7,851,811 | (172,273) | I |
| 6–30–94 | NLH–184 (accrual) | 6,137,915 | 7,971,773 | (1,833,858) | I |
| 6–30–94 | NLH–144 (cash) | 3,605,993 | 1,663,461 | 1,942,532 | S |
| 6–30–94 | NLH–186 (cash) | 3,603,532 | 1,663,461 | 1,940,071 | S |
| 6–30–94 | P. 595 | 5,526,554 | 8,408,393 | (2,881,839) | I |
| 6–30–94 | P. 209, 210 | 5,526,555 | 8,408,394 | (2,881,839) | I |
| 6–30–94 | NLH–341 | 8,502,455 | 7,526,266 | 976,189 | S |
| 7–31–94 | NLH–239 | 5,423,568 | 5,462,735 | (39,167) | I |
| 7–31–94 | P. | 5,645,181 | 8,509,999 | (2,864,818) | I |
| 8–31–94 | NLH–239 | 5,369,812 | 6,167,538 | (797,726) | I |
| 8–31–94 | P. 570 | 5,350,584 | 9,327,664 | (3,977,080) | I |
| 9–30–94 | P. 569 | 5,386,719 | 6,052,445 | (665,726) | I |
| 9–30–94 | NLH–239 | 4,630,185 | 5,357,882 | (727,697) | I |
| 10–31–94 | NLH–239 | 5,057,195 | 6,078,118 | (1,020,923) | I |

4. "S" means solvent on the balance sheet test; "I" means insolvent.

| DATE | EXHIBIT | ASSETS | LIABILITIES | NET WORTH | S/I [4] |
|------|---------|--------|-------------|-----------|-----|
| 10–31–94 | P. 568 | 9,669,767 | 14,708,882 | (5,039,115) | I |
| 11–30–94 | P. 567 | 9,858,035 | 15,382,394 | (5,524,359) | I |
| | | | | | |
| 1–31–95 | P. 751 | 10,967,431 | 17,455,559 | (6,488,128) | I |
| 2–28–95 | P. 750 | 11,718,590 | 18,755,948 | (7,037,358) | I |
| 3–31–95 | P. 749 | 11,942,253 | 19,573,690 | (7,631,437) | I |
| 4–30–95 | P. 748 | 11,927,640 | 19,545,969 | (7,618,329) | I |
| 5–31–95 | P. 747 | 12,454,849 | 20,043,934 | (7,589,085) | I |
| 6–30–95 | P. 746 | 11,926,324 | 20,823,091 | (8,896,767) | I |
| 7–31–95 | P. 745 | 13,123,197 | 21,030,501 | (7,907,304) | I |
| 8–31–95 | P. 744 | 12,444,421 | 20,141,860 | (7,697,439) | I |
| 9–30–95 | P. 743 | 12,371,292 | 20,908,403 | (8,537,111) | I |
| 10–31–95 | P. 742 | 12,301,272 | 14,275,944 | (1,974,672) | I |
| 11–30–95 | P. 741 | 12,412,449 | 21,070,604 | (8,658,155) | I |
| 12–31–95 | P. 321 | 11,525,000 | 18,103,000 | (6,578,000) | I |
| 12–31–95 | P. | 8,304,036 | 23,466,557 | (15,162,521) | I |
| | | | | | |
| 1–24–96 (Ch. 11 filed. Sch.listed:) | P. 767 | 24,225,043 | 19,510,873 | 4,714,170 | S |

(See, also, Michael Cox Report, P. 175 at Ex. "D" and "E"). VASI was insolvent, on the balance sheet, on May 10, 1994, December 29, 1994, and November 22, 1995.

### C. VASI's Lease from TAHI

Turbo Aire Holdings, Inc. ("TAHI" or "Turbo Aire"), a Nevada corporation, is primarily a real estate holding company. Clark was originally the sole shareholder of TAHI, but in 1992, Cole became a fifty percent (50%) shareholder. Clark and Cole are and were, at all times material hereto, officers and members of the board of directors of TAHI (SF).

After April, 1993, the primary asset of TAHI was the real property and improvements constituting an airport facility adjoining the Tucson International Airport, located at 1000 East Valencia in Tucson, Arizona. TAHI also had an option, which it never exercised, to purchase all of the common stock of Viscount (SF).

Viscount's principal offices were located on the Valencia property until May, 1996 and, thus, TAHI was Viscount's landlord for a number of years (SF).

On October 2, 1992, Cole purchased the Valencia Property from the Small Business Administration (SBA) for $800,000. (SF). At the time of the acquisition, TAHI was the lessee of the Valencia Property from the SBA (SF; P. 290). On or about April 15, 1990, Viscount entered into a sublease with TAHI, wherein Viscount agreed to lease a portion of the Valencia Property for a monthly rent of $5,000.00 (SF). The lease was for a period of three years, lasting until April 30, 1993 (SF). After the lease expired, Viscount and TAHI entered into a new lease for a portion of the Valencia Property for a five-year term (SF). The agreed rental was increased to $15,000 per month. (NLH–224).

The obligations of Viscount under the lease were secured, pursuant to a Chattel Security Agreement between Viscount as the Debtor, and TAHI as the "Secured Party," which encumbered all of the personal property assets of Viscount. (SF; NLH–224). BAE leased the remaining

portion of the Valencia Property from TAHI at the same monthly rental amounts as Viscount (SF).

In July 1993, the Valencia Property was in need of repairs which were anticipated to cost approximately $300,000. On July 15, 1993, TAHI and Viscount entered into a letter agreement concerning making certain improvements to the Valencia Property (SF). This agreement allowed the tenants a rent abatement of approximately $300,000, so that VASI and BAE could make the needed improvements (P. 4, 185; NLH–83).

In August, 1993, the Coles transferred the property to TAHI, in return for a note and a $160,000 cash payment from a separate entity controlled by Clark, Zoltan Enterprises, Inc. (P. 289, 290, 787). At almost the same time, TAHI pledged the real property to the National Bank of Arizona, guaranteeing and securing the $250,000 letter of credit for VASI.[5] This enabled VASI to meet its insurance deductible commitments to Polaris on the various leased aircraft (P. 293; NLH–82). The consideration for this guarantee, made by TAHI on VASI's behalf, was only a promise of "reasonable compensation" which was "to be negotiated" (P. 293). No evidence in this matter was presented as to what that consideration became or was, or if it ever materialized.

In May, 1994, TAHI granted VASI a 6–month forbearance on its rent, in return for a rent guarantee from 9 Lives (P. 192). No evidence was presented which showed that 9 Lives ever made a rent payment on VASI's behalf, or indeed, that TAHI ever made demand on the guarantee.

When VASI filed for bankruptcy protection, TAHI, on March 14, 1996, filed a claim for past due rent in the amount of $394,093.96 (P. 220). TAHI also filed a claim in 9 Lives' bankruptcy for 396,497.54,

representing VASI's past due rent and the liability on 9 Lives' guarantee.

### D. Tucson Aerospace (BAE Aviation, Inc.)

Prior to 1992 and the transaction between Cole and TAHI, all of the stock of Tucson Aerospace was owned by Cole (SF). Tucson Aerospace, at one time, was certified by the FAA to repair aircraft; however, Tucson Aerospace ceased operations in 1996 (SF).

At various relevant times, between 1994 and 1996, Tucson Aerospace performed a substantial portion of the maintenance on the aircraft leased by Viscount. Viscount constituted approximately 90 percent or more of Tucson Aerospace's business (SF). Tucson Aerospace also leased a portion of the Valencia Property from TAHI (SF; NLH–224). On July 15, 1993, TAHI abated $12,500 of the $15,000 per month rent payment, for one year, so that Tucson Aerospace and VASI could make needed, $300,000 improvements to the 1000 E. Valencia premises (P. 4; NLH–224).

In October 1994, Cole withdrew from any interest in Tucson Aerospace (SF).

On March 14, 1996, Tucson Aerospace filed a claim in the VASI bankruptcy for $1,618,772.67 (P. 221), for unpaid work performed on VASI's fleet.

### E. 9 Lives Holdings, Inc. ("NLH" or "9 Lives")

Nine Lives Holdings, Inc., a Nevada corporation, was incorporated in November 1988 (SF; p. 348). The shareholders of 9 Lives are Cole and Clark, either directly or indirectly through their respective related companies or trusts ("Wolfjet" for Clark and "Cole Family Trust" for Cole) (P. 766). Each owns a fifty percent (50%) interest in 9 Lives (SF). Clark and Cole are and were, at all times material hereto, officers and members of the board of directors of 9 Lives (SF).

---

5. This Deed of Trust was released when the letter of credit was terminated in October, 1994.

Until May, 1994, 9 Lives had been an inactive corporation, and its 1993 tax return indicated "inactive," with neither income generated nor expenses paid (P. 314). 9 Lives stirred, however, in the Spring of 1994, when the Bernstein and VASI negotiations were becoming serious.

Three transactions involving 9 Lives are challenged by the trustee in this case: (1) an alleged fraudulent conveyance of the 308; (2) an alleged fraudulent conveyance of the 4501; and (3) the Nordam hushkit transaction—an alleged theft of a corporate opportunity. Each will be discussed in turn.

### 1. VASI's Assignment and Leasebacks of Two Airplanes

On May 10, 1994, Viscount assigned its interests in the 308 Lease and the 4501 Lease to 9 Lives pursuant to two "Agreements for Assignment of Aircraft Lease" (SF). The Lease Assignments stated that the consideration for the assignments of the Leases was: (1) relieving Viscount's obligations to GECAS under the Leases, and (2) 9 Lives' guarantee of certain Viscount obligations to TAHI (SF; P. 118, 119).

Concurrent with each Lease Assignment, 9 Lives *subleased back* the 308 and the 4501 to Viscount, pursuant to the 9 Lives Holdings, Inc. Sublease of Aircraft to Viscount Air Services, Inc. (the "Sublease Agreement") (all of the transactions pursuant to the Lease Assignment and the Sublease Agreement may be collectively called the "May 10, 1994 Transactions") (SF).

The Sublease Agreements provided that VASI was to pay a monthly rental on each aircraft of $40,000 per month (SF). In turn, the GECAS leases each called for a $35,000 per month rent for each plane. Thus, 9 Lives received a net monthly $10,000 income for the two planes (P. 13).

The Sublease Agreements also required Viscount to continue paying the maintenance reserves and other costs associated with both the 308 and the 4501.

According to James W. Linnan of Polaris/GECAS, that entity (the owner) was unaware of the assignment from VASI to 9 Lives, and GECAS did not consent to that assignment. No document was submitted to show that GECAS consented to these assignments. No public document was recorded anywhere, especially at the FAA, to evidence the transfer of the planes. Insofar as either the owner/lessor, the creditors, or the public record was concerned, VASI was still the lessee/equitable owner of both the 308 and 4501 aircraft.

### 2. 9 Lives' Purchase and Exercise of the Option on the 308

On December 29, 1994, the purchase option on the 308 was exercised when VASI provided written notice to GECAS (SF; NLH–64). At that time, GECAS was holding maintenance reserves for the 308 in the amount of $237,978, and a security deposit in the amount of $25,000.00 (SF). The option price of the 308 was $700,000, and it was paid as follows: cash from 9 Lives in the amount of $437,032.00; a credit of $237,978 for the maintenance reserves; and a credit of $25,000.00 for the security deposit previously paid by Viscount to GECAS at the inception of the Lease (SF; pp. 441, 443). VASI directed that the title be delivered to 9 Lives (P. 441), and it was.

Nine Lives borrowed the cash component of the 308 purchase price from Clark and Cole and executed a demand promissory note dated December 27, 1994, secured by a lien on the 308. (P. 121). Title to the plane was transferred to 9 Lives, and the GECAS lease was terminated (pp. 78, 442, 443; NLH–64, 66). GECAS acknowledged the payoff, and the transfer of the title to 9 Lives. (P. 60; NLH–65).

After the purchase option on the 308 was exercised, 9 Lives continued to lease the 308 to Viscount pursuant to the Sublease Agreement, until December 6, 1995(SF). Viscount continued, as it had been doing, to pay maintenance reserves on the 308 to either GECAS (during the

term of the GECAS lease) or to 9 Lives (SF). From December 29, 1994, until at least December 6, 1995, Viscount continued to carry the 308 on its FAA operating certificate (SF).

In March 1995, 9 Lives demanded that VASI keep its lease payments current (P. 284), and rejected VASI's effort to gain rent concessions during its downward financial spiral (P. 223).

On November 10, 1995, 9 Lives cancelled the lease to VASI, because of a monetary default. (NLH–312).

### 3. 9 Lives' Purchase and Exercise of the Option on the 4501

On November 22, 1995, VASI exercised the option to purchase the 4501 airplane (SF). The agreed exercise price was $834,000.00 (SF; NLH–68, 69; pp. 402, 445). Pursuant to VASI's instruction, GE-CAS then conveyed, by Bill of Sale, the 4501 to 9 Lives (P. 403).

At the time of the exercise of the option, GECAS was holding maintenance reserves in the amount of $356,930.50, and a security deposit in the amount of $25,000.00 (P. 405). 9 Lives paid the option price by remitting $452,069.50 to GECAS and by applying, as a credit against the purchase price, the maintenance reserves in the amount of $356,930.50 and the security deposit of $25,000.00 which had been paid by Viscount at the inception of the lease (SF; P. 405).

Cole and Clark again loaned money to 9 Lives to pay the cash component of the 4501's option (SF). In return, they were given a lien for the amount of the payoff loan (NLH–173).

### 4. The Nordam Transaction

Between October 9 and December 1, 1995, Nordam approached both Viscount and 9 Lives regarding a proposed transaction by which Nordam would lease a plane from Viscount, install a hushkit (essentially a muffler for an airplane engine) on the

plane, and fly test runs of the aircraft (SF; P. 140, 451; NLH–91). The monthly rent proposed to be paid by Nordam was to be $125,000.00, which was to be credited against the $1 million purchase price of the hushkit (SF). All agreed that this was a good price for a hushkit, and a painless way to acquire one.

The proposed purchase price for the hushkit was lower than the $1.7 million price that Nordam listed in its advertising materials, and it was less than the $1.25 million Nordam generally offered to other customers. Hushkits had been in considerable demand since the FAA adopted regulations requiring that all older "Stage II" aircraft, such as Viscount's 737s, be hushkitted by the end of 1999. In addition, certain varying percentages of an operator's fleet were required to be hushkitted between 1994 and 1999. Moreover, certain airports, such as Orange County's John Wayne Airport, would only allow "hushed" airplanes to land at their airports (SF).

The Nordam Transaction was not ultimately consummated on the 310 airplane owned by VASI, but, rather, on the 308 which was owned by 9 Lives (SF). The deal was finally approved on March 15, 1996, two months after VASI had filed chapter 11 (P. 141, 142, 559).

Nordam continued to lease the 308 from 9 Lives for $125,000.00 per month for well over a year, through June 30, 1997 (SF; P. 807). Four lease extensions were executed (P. 807). The hushkit was eventually fully paid for through offsets of Nordam lease payments (P. 76, 148). 9 Lives' aircraft, the 308, now is in conformity with FAA hushkit compliance requirements.

### 5. Nine Lives' Financial Condition

Nine Lives' financial condition, during its active period, according to the only relevant financial information submitted, was:

| DATE | EXHIBIT | ASSETS | LIABILITIES | NET WORTH |
|------|---------|--------|-------------|-----------|
| 1993 | P. 314 | inactive | inactive | apparently none |
| 3–31–95 | P. 310 | 892,757 | 700,000 | 192,757 [6] |
| 3–31–95 | P. 149; 468; NLH–87 | 560,757 | 566,000 | (5,243) |
| 3–31–96 | NLH–166; P. 471, P. 106 | 1,962,616 | 1,300,022 | 662,594 |
| 3–31–96 | P. 318 | 1,702,860 | 1,781,431 | (78,571) |
| 10–3–96 | P. 319 | 1,512,797 | 845,000 | 667,797 |
| 3–31–97 | P. 105 | 2,107,956 | 1,012,168 | 1,095,788 |
| 12–15–97 | P. 766 (Bankr. Schedules) | 9,890,973 | 3,307,486 | 6,583,487 |

### 6. 9 Lives' Chapter 11

On December 16, 1997, 9 Lives filed a voluntary petition under chapter 11 of the Bankruptcy Code, which case is currently pending before this court (P. 766). 9 Lives listed its total assets at $9,890,973 and its total liabilities at $3,307,486 (P. 766). It stated in its schedules that it had no ongoing income nor expenses (P. 766). To date, no plan has been confirmed.

### LEGAL DISCUSSION

### A. Fraudulent Conveyances of the two Aircraft (Counts 1, 2, 3, and 6)

■■■ In choosing to sue 9 Lives on fraudulent conveyance theories, the plaintiff has invoked both state law and federal bankruptcy law. Section 544 of the Bankruptcy Code allows a trustee to employ, at his option, any state law theory which advances the aims of the estate. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 807 (9th Cir.1994); *Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1014 (5th Cir.1985) (trustee's strong arm powers serve to marshal all of the debtor's assets in order to enhance the resources available to the creditors); *Hansen v. Finn (In re Curry & Sorensen, Inc.)*, 57 B.R. 824, 829 (9th Cir. BAP 1986) (under § 544, the trustee "holds the full gamut of remedies that applicable state law makes available to any creditor of the debtor"). In this instance, utilizing § 544, the plaintiff has chosen Arizona's version of the fraudulent conveyance statute, principally because the limitations period is longer than the one-year period provided under the similar bankruptcy version, 11 *U.S.C.* § 548. Thus, the plaintiff's "reach-back" period is longer under Arizona law, which is three years. *Ariz.Rev.Stat.* § 12–543; *Babcock v. Tam*, 156 F.2d 116, 121 (9th Cir.1946); *Nunez v. Interstate Corporate Systems, Inc.*, 165 Ariz. 410, 411, 799 P.2d 30, 31 (App.1990). This period may arguably be four years. *Ariz.Rev.Stat.* § 44–1009(A)(2). Proceeding under state law is necessary because the conduct commencing the challenged transfers occurred May 10, 1994, approximately 1 year and 10 months before the VASI chapter 11 filing on January 24, 1996. Bankruptcy law allows an estate or its representative two years from the order of relief (January 24, 1996) to bring an action pursuant to § 544, if it has not yet lapsed under state law at the time of the bankruptcy filing, which are the facts in this case relative to the events of May 10, 1994. *See Acequia*, 34 F.3d at 807; *Taylor v. Hosseinpour–Esfahani (In re Hosseinpour–Esfahani)*, 198 B.R. 574, 577 (9th Cir. BAP 1996) ("Section 546(a)(1) sets forth the applicable statute of limitations period for avoidance actions" under Section 544);

---

6. Of this amount, $192,000 was then distributed to the owners, leaving the corporation with only $757 in cash (P. 312).

11 *U.S.C.* § 546(a)(1). Thus, this action was timely filed.

In addition, with respect to Counts 1 and 2, the trustee has elected to use § 544 and state law in connection with 9 Lives' sale consummation and acquisition of the title on the 308, because that concluding event occurred on December 29, 1994—more than the § 548's one-year "reach back" period. With regard to Count and the final title acquisition of the 4501 however, that concluding event occurred on November 22, 1995, within § 548's one-year limitation period.

Count 1 alleges that the May 10, 1994 transfers, from VASI to 9 Lives, of both the 308 and 4501 aircraft, constituted the beginning acts of the fraudulent conveyances, while Counts 2 and 3 separately list the transfer and delivery of title of each plane and its respective maintenance reserves and security deposits. Count 6 seeks the remedy of the imposition of an equitable lien until the planes are returned. In essence, although split into four counts, the challenged conduct of the May 10, 1994 assignments and their aftermath combine in the plaintiff's effort to recover two planes, and therefore the relief granted herein will encompass and dispose of Counts 1, 2, 3 and 6.

█ With regard to the use of state law (Counts 1 and 2), encompassing the May and December 1994 transactions, outside the reach of § 548, the plaintiff relies upon two sections of the Arizona Statutes, *Ariz. Rev.Stat.* §§ 44–1004(A)(2) and 44–1005, while Count 3 relies on § 548's fraudulent transfer provisions for the November 22, 1995 transaction. Since plaintiff has chosen, for two of the counts, to utilize a state law theory in order to recover assets for the estate, state law, rather than federal law, governs the legal criteria applicable to the facts. *Acequia,* 34 F.3d at 818 and n. 4 (state prejudgment interest law applies via section 544(b)); *Duck v. Munn (In re Mankin),* 823 F.2d 1296, 1298 (9th Cir. 1987), *cert. denied,* 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988) ("Section 544(b) gives to the trustee the power to avoid any conveyances which an unsecured creditor could have avoided under applicable state law."). In applicable part, *Ariz. Rev.Stat.* § 44–1004(A)(2) states:

A. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation under any of the following:

\* \* \* \* \* \*

2. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, *and* the debtor either;

(a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(b) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due (emphasis supplied).

Section 44–1005 of the Arizona statute provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a *reasonably equivalent value in exchange* for the transfer or obligation *and* the debtor was *insolvent* at that time *or* the debtor *became insolvent* as a result of the transfer or obligation. (emphasis supplied).

█ From the evidence presented, the court is satisfied that the plaintiff did not prove, by a preponderance of the evidence, the required elements of § 44–1004(A)(2). While major sub-element (2) was proven, *i.e.* lack of a reasonably equivalent value,

the minor required sub-elements of "unreasonably small remaining assets" or "intent to incur debts" which were beyond the ability of the debtor to pay as they became due were not satisfied. When the May 10, 1994 transfers occurred, VASI was on the verge of acquiring a new, major shareholder whose financial resources appeared to improve the company's financial wherewithal. At that time, Bernstein's acquisition was seen as an enhancement by VASI's major creditor, GECAS/Polaris, which was willing to extend additional accommodations and credit to VASI due to that positive development. In fact, VASI's ability to borrow from the Bernstein entities proved accurate, resulting in total capital infusions, up to bankruptcy, by Bernstein's Rock–It Cargo, of $3,707,630.47 (P. 51). Additionally, the company continued to operate, even after bankruptcy was filed, for two and one-half years after the May 10, 1994 transfers, before VASI finally ceased operations on October 28, 1996. Consequently, the plaintiff failed in its burden to prove the minor sub-elements (a) and (b) of *Ariz.Rev.Stat.* § 44–1004(A)(2)(a) and (b).

However, the plaintiff did prevail on proving the required elements of *Ariz. Rev.Stat.* § 44–1005. The first issue to be determined under the constructive fraudulent transfer statute is whether VASI received "a reasonably equivalent value in exchange for the transfer or obligation." In construing this phrase, we look to both state and federal law for guidance.

Arizona's fraudulent transfer law is an adoption of the Uniform Fraudulent Transfer Act, and parallels 11 *U.S.C.* § 548. In states which have adopted the uniform act, the two statutes have been interpreted similarly by the courts. *See Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 577 (7th Cir.1998) ("the UFTA is a uniform act, and it derived the phrase 'reasonably equivalent value' from 11 U.S.C. § 548(a)(2)"); *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944

F.2d 589, 597 (9th Cir.1991); 5 COLLIER ON BANKRUPTCY § 548.LH[5] (15th ed. 1998) (UFTA cases should be "valuable precedent for cases decided under the Code, and vice versa").

Cases decided under the precursor of the UFTA, the Uniform Fraudulent Conveyance Act (UFCA), held that the requirement under that act of proving "fair consideration" was analogous to "reasonably equivalent value" under § 548. *Diamant v. Hansen (In re Curry & Sorensen, Inc.)*, 112 B.R. 324, 326 and n. 2 (9th Cir. BAP 1990). The Ninth Circuit Court of Appeals has explained that the determination of "fair consideration" under the UFCA, and "reasonably equivalent value" under current law, are both made "from the viewpoint of the creditors," i.e., whether the estate lost value from the standpoint of the creditor. *Maddox v. Robertson (In re Prejean)*, 994 F.2d 706, 708–09 (9th Cir.1993).

Arizona cases have held that fair consideration exists when from "all circumstances considered, there [is] a reasonable and fair proportion between the one and the other." *Zellerbach Paper Co. v. Valley National Bank*, 13 Ariz.App. 431, 436, 477 P.2d 550, 555 (1970) (citing *Neal v. Clark*, 75 Ariz. 91, 95, 251 P.2d 903, 906 (1952)); *see also United Energy Corp.*, 944 F.2d at 595 (a proportionate reduction in rights or liability constitutes an exchange of reasonably equivalent value); *Marshack v. Wells Fargo Bank (In re Walters)*, 163 B.R. 575, 581 (Bankr.C.D.Cal.1994) (a proportionate reduction in rights or liability constitutes an exchange of reasonably equivalent value).

The analysis for determining reasonably equivalent value is directed at comparing what the debtor surrendered and what the debtor received in return. *United Energy Corp.*, 944 F.2d at 597. The court looks to see if what the debtor received was "in the range of a reasonable measure of the value" of what the debtor transferred. *Erie Marine Enterprises,*

*Inc. v. Algoma Central Marine (In re Erie Marine Enterprises, Inc.),* 213 B.R. 799, 803 (Bankr.W.D.Pa.1997); *Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.),* 168 B.R. 408, 419 (Bankr.D.Ariz. 1994) (§ 548 "does not require exact equality but rather reasonable equivalence"). "The proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors." *Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.),* 956 F.2d 479, 484 (4th Cir.1992).

■■■ Outside of a foreclosure context, reasonably equivalent value ordinarily means "similar to fair market value." *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 545, 114 S.Ct. 1757, 1765, 128 L.Ed.2d 556 (1994) (dictum). The assets involved in the contested transfer should be measured at their market value at the time of transfer. *See Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.),* 174 B.R. 557, 578 (Bankr.N.D.Cal.1994). One benchmark utilized by the courts is that a value to the debtor within 70% of the creditor's recovery is "reasonably equivalent." *See Durrett v. Washington Nat'l Ins. Co.,* 621 F.2d 201, 203 (5th Cir.1980); *Pajaro Dunes,* 174 B.R. at 590 (receipt of $541,895.55 in value in return for $1 million obligation [about 54%] was not reasonably equivalent value).

■■■ Before the court determines if the debtor received "reasonably equivalent value," however, it must first determine whether the debtor received any "value" or benefit from the transaction. *See Mellon Bank, N.A. v. Official Committee of Unsecured of R.M.L., Inc. (In re R.M.L., Inc.),* 92 F.3d 139, 149–50 (3d Cir.1996). Value, under the Arizona statute, is defined as follows:

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise to furnish support to the debtor or another person unless the promise is made in the ordinary course of the promisor's business.

*Ariz.Rev.Stat.* § 44–1003(A).

■■■ The type of transfer which harms creditors is one in which the transfer places the property outside of the reach of a hypothetical creditor. In other words, the transfer occurs when it becomes "so perfected that a bona fide purchaser from the debtor" can no longer acquire an interest in the property. 11 *U.S.C.* § 548(d). Under state law, a transfer is made "when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien through attachment, garnishment, levy or other process...." *Ariz.Rev.Stat.* § 44–1006(1)(b).

With the foregoing law in mind, I now turn to the evidence in this case. The evidence showed that on May 10, 1994, 9 Lives paid no money or other equivalent consideration to VASI for the transfer of the two planes and all of the planes' attendant assets (including engines, maintenance reserves and security deposits). The parties stipulated that the consideration stated in the assignments consisted of:

> (1) Relieving VASI's obligations to GECAS under the leases; and

> (2) guaranteeing certain rent obligations to TAHI (Turbo Aire Holdings, Inc.).

(Joint Pretrial Statement, at 23, para. (H)(2)).

VASI received no benefit from the rent guarantee. No evidence was presented which showed that 9 Lives ever paid off (or indeed paid any of) VASI's obligations to TAHI. Nor was VASI relieved of the debt. TAHI filed a claim in VASI's bankruptcy for unpaid rent of $394,093.96 (P. 220). Corroborating this, TAHI is listed, as an unsecured creditor in *9 Lives'* bankruptcy, for $396,497.54 for the "guaranty of debt of Viscount Air Services, Inc. for rent of premises by Viscount." Thus, the evidence is clear that 9 Lives never gave

value, because it never *paid* any amount relative to the rent guarantee. The guarantee was illusory and of no value to VASI. 9 Lives' unfulfilled executory promise did not benefit the estate's creditors. See *Hay v. Duskin,* 9 Ariz.App. 599, 604, 455 P.2d 281, 286 (1969). Only the satisfaction by payment of the debtor's contingent rental liability might have constituted reasonably equivalent value. See *Ragsdale v. Bank South, N.A. (In re Whitacre Sunbelt, Inc.),* 206 B.R. 1010, 1022 (Bankr.N.D.Ga. 1997); *Ariz.Rev.Stat.,* § 44–1003.

As for the purported consideration of relieving VASI of its lease obligations to GECAS, it is undisputed that GECAS never released VASI from its contractual obligations, even though 9 Lives paid the option prices and acquired title to the two aircraft, advancing its own or borrowed money to do so, as follows:

| | | |
| ----- | --- | ------------ |
| 308 | --- | $437,032.00 |
| 4501 | --- | $452,069.50 |
| | | $889,101.50 |

GECAS was not advised of the VASI—9 Lives Assignment, and GECAS never consented to adding 9 Lives to the lease agreements (Depo. of Clark, Oct. 24, 1997 at 166–167; depo. of Cole at 241–242). Thus, 9 Lives had no liability on the GECAS/Polaris leases on either the 308 or the 4501. And GECAS, not VASI, was paid the $889,101.50. The GECAS leases either prohibited entirely, or required preapproval for any attempted transfers or subleases (P. 11 at para. 6(a); P. 386 at para. 6(a)). To be effective, any change to the written agreements between GEAS and VASI was required to be in writing (P. 11 at para. 20(1); P. 386 at para. 20(1)). No evidence was presented which showed this requirement to have been waived, or that GECAS agreed to VASI's transfer of the two planes to 9 Lives on May 10, 1994, or at anytime prior to the actual payoffs. Case law establishes that no reasonable consideration flowed to VASI by 9 Lives' meaningless "guarantee" of the GECAS or TAHI obligations, because VASI *remained* liable on both obligations, and 9 Lives never obligated itself contractually to GECAS or TAHI. *See United Energy Corp.,* 944 F.2d at 595 (a proportionate reduction in rights or liability constitutes an exchange of reasonably equivalent value); *Zelman v. Esher (In re C.S. Mersick & Co.),* 1 B.R. 599, 602 (Bankr.D.Conn.1979) (release of obligations under lease in exchange for security deposit was a "bargained-for and reasonable exchange"). Moreover, the evidence did not reveal that 9 Lives ever made a single lease payment to GECAS, unless the payment had first been received from VASI.

▬ Even construing the facts most favorably to 9 Lives, a review of the evidence shows that VASI did not receive reasonably equivalent value. The "bottom line" is that, for the eventual exercise of option payments totalling $889,101.50, 9 Lives received two 727 planes, their engines, maintenance reserves, security deposits and a $5,000–$10,000 per month income stream totalling $125,000. This was a value of $2,303,908.50, as calculated in the following paragraphs.

▬ By the dates of payoff, 9 Lives had received an additional $5,000 in rental payments for each plane, for the intervening months between the May 10, 1994 assignment to the eventual payoff and transfer on each plane, as follows:

| Plane | Assignment to 9 Lives | Months of Rent paid to NLH from VASI to the date of GECAS payoff | Payoff Date | Add'l Rent($5,000 per month collected by 9 Lives) |
| ----- | --------------------- | --------------------------------------------------------------- | ----------- | ------------------------------------------------- |
| 308 | May 10, 1994 | 7 | Dec. 29, 1994 | $ 35,000 |
| 4501 | May 10, 1994 | 18 | Nov. 22, 1995 | $ 90,000 |
| **TOTAL** | | | | **$125,000** |

What did 9 Lives acquire, as of the date it exercised the purchase options—the statutory "transfer" dates? As for the 308 airplane, on May 10, 1994 and December 29, 1994, 9 Lives obtained, for an out-of-pocket payment of $437,032:

| 1) | Plane and engines worth the option price of | $700,000.00 |
| 2) | Monthly lease payments for 7 months | $ 35,000.00 |
| 3) | Accrued maintenance reserves | $237,978.00 |
| 4) | Security deposit | $ 25,000.00 |
| | | $997,978.00 |

Similarly, as for the 4501, on the transfer dates of May 10, 1994 and November 22, 1995, 9 Lives received, for an out-of-pocket payment of $452,069.50:

| 1) | Plane and engines worth the option price of | $ 834,000.00 |
| 2) | Monthly lease payments for 18 months | $ 90,000.00 |
| 3) | Accrued maintenance reserves | $ 356,930.50 |
| 4) | Security deposit | $ 25,000.00 |
| | | $1,305,930.50 |

In sum, 9 Lives received value totalling:

| 308 | $ 997,978.00 |
| 4501 | 1,305,930.50 |
| | $2,303,908.50 |

for a total out-of-pocket expenditure of $889,101.50. Even construing these facts most favorably to 9 Lives, this represents, at best, a 38.59% consideration to VASI and its creditors. It should be noted, however, that it was GECAS, not VASI, that *received* the total option payments. VASI did not receive 38.59% of the value of the planes at the time of the May 10, 1994, December 29, 1994 or November 22.1995 transfers. Under applicable case law, the court concludes that VASI's transfers to 9 Lives were not made for reasonably equivalent consideration. The plaintiff therefore satisfied the first element of *Ariz.Rev. Stat.* § 44–1005. The value of the transferred assets is established as of the date that the transfers put the assets beyond the reach of creditors. *In re Morris Communications,* 914 F.2d 458, 466 (4th Cir. 1990); *In re Pajaro Dunes Rental Agency,* 174 B.R. 557, 578 (Bankr.N.D.Cal.1994). Those dates were December 29, 1994 (the 308) and November 22, 1995 (the 4501). Their values were what the options called for—$700,000 and $834,000, plus security deposits, maintenance reserves and income stream.

 The second element requires the debtor to either be insolvent at the time of the transfer, or to have become insolvent as a result of the transfer. *Ariz.Rev.Stat.* § 44–1005. Insolvency can be either "balance sheet" (assets less liabilities) or "equitable" (generally not paying debts as they become due). Statutory definitions cover both tests:

A. A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

B. A debtor who is generally not paying his debts as they become due is presumed to be insolvent.

*Ariz.Rev.Stat.* § 44–1002. The critical dates for this analysis are May 10, 1994, December 29, 1994, and November 22, 1995, the dates that the transfers began and ended. After reviewing the evidence, the court concludes that VASI was indeed insolvent on all such dates. This conclusion is reached by reviewing VASI's own financial statements. Except for a 9 Lives' exhibit, which conveniently shows a solvent status for the May 1994 date, the financial statements for significant periods before, during and after each of the challenged transfers show VASI to be insolvent under the balance sheet test. Because of their contemporaneous inherent

consistency, the plaintiff's exhibits are accepted as more credible than 9 Lives' conclusions.[7] Thus, plaintiff satisfied the "balance sheet" test.

Turning to the "equitable" test of solvency, the court must consider whether, as of May 10, 1994, December 29, 1994 and November 22, 1995, VASI was generally paying its debts as they became due. It appears from the evidence that VASI was not doing so on these critical dates. This area, however, is not as clear in view of testimony and evidence which revealed that critical payments—those necessary to keep VASI flying—were apparently being made, while those which were not as urgent were carried for longer periods. Yet, on May 10, 1994, VASI was showing total liabilities of $1,948,807, with vendors due payment of 60–days or older to be $617,646 (31%). VASI's internal financial reports reflect the following:

| PERIOD | OVER 30 DAYS | OVER 60 DAYS | TOTAL PAYABLES | PERCENTAGE OF 60 DAY AND OLDER PAYABLES TO TOTAL |
|---|---|---|---|---|
| September 30, 1993 | $ 13,594.24 | $ 9,184.61 | $ 54,166.77 | 16% |
| October 31, 1993 | $ 30,931.28 | $ 23,678.85 | $ 286,955.42 | 8% |
| November 30, 1993 | $ 232,712.14 | $ 66,218.43 | $ 348,000.30 | 19% |
| December 31, 1993 | $ 50,343.91 | $ 299,827.85 | $ 515,427.33 | 58% |
| January 31, 1994 | $ 166,263.52 | $ 352,353.74 | $ 629,486.04 | 55% |
| February 28, 1994 | $ 110,930.47 | $ 506,592.70 | $ 740,138.69 | 68% |
| March 31, 1994 | $ 126,177.90 | $ 617,646.28 | $1,048,807.78 | 58% |
| April 30, 1994 | $ 305,916.55 | $ 738,360.23 | $1,533,732.30 | 48% |
| May 31, 1994 | $ 492,692.99 | $1,050,560.49 | $2,604,151.39 | 40% |
| June 30, 1994 | $ 661,133.08 | $1,191,032.20 | $4,482,405.07 | 26% |
| July 31, 1994 | $1,176,722.43 | $1,289,113.71 | $3,992,825.82 | 32% |

(P. 802, 803, 804). Other VASI reports show VASI's trade payables and aging accounts to be steadily increasing:

| PERIOD | OVER 30 DAYS | OVER 60 DAYS | TOTAL TRADE PAYABLES | OVER 60+ PERCENTAGES |
|---|---|---|---|---|
| April 30, 1994 | --- | --- | $2,518,641 | --- |
| April 30, 1994 | --- | --- | $2,515,119 | --- |
| May 31, 1994 | --- | --- | $2,742,099 | --- |
| May 31, 1994 | --- | --- | $2,744,232 | --- |
| June 30, 1994 | --- | --- | $3,360,879 | --- |
| June 30, 1994 | $ 638,153 | $1,121,124 | $4,341,663 | 25% |
| June 30, 1994 | --- | --- | $4,065,892 | --- |
| July 31, 1994 | $1,199,350 | $1,199,350 | $3,716,584 | 32% |
| July 31, 1994 | --- | --- | $2,073,810 | --- |
| August 31, 1994 | $ 675,102 | $1,149,379 | $3,691,218 | 31% |

7. A member of Bernstein's due diligence team, Karen Chiu, Rock–It's Chief Financial Officer, also concluded that VASI's "current liabilities exceeded their current assets." (Chiu depo. at 114).

| PERIOD | OVER 30 DAYS | OVER 60 DAYS | TOTAL TRADE PAYABLES | OVER 60+ PERCENTAGES |
|---|---|---|---|---|
| August 31, 1994 | --- | --- | $2,982,856 | --- |
| September 30, 1994 | --- | --- | $2,345,582 | --- |
| October 12, 1994 | $ 509,410 | $1,233,272 | $3,131,297 | 39% |
| October 31, 1994 | --- | --- | $3,088,055 | --- |
| November 30, 1994 | --- | --- | $3,468,742 | --- |
| January 31, 1995 | --- | --- | $2,234,874 | --- |
| February 28, 1995 | --- | --- | $3,216,240 | --- |
| March 23, 1995 | $ 967,633 | $2,170,311 | $4,539,825 | 47% |
| March 31, 1995 | --- | --- | $4,179,060 | --- |
| April 30, 1995 | --- | --- | $5,141,259 | --- |
| May 31, 1995 | --- | --- | $5,741,396 | --- |
| June 30, 1995 | --- | --- | $6,583,256 | --- |
| July 31, 1995 | --- | --- | $5,914,357 | --- |
| August 31, 1995 | --- | --- | $5,757,835 | --- |
| September 26, 1995 | $ 472,828 | $5,469,567 | $6,350,516 | 86% |
| September 30, 1995 | --- | --- | $5,665,835 | --- |
| October 31, 1995 | --- | --- | $6,281,554 | --- |
| November 30, 1995 | --- | --- | $6,883,530 | --- |
| December 29, 1995 | $ 299,555 | $4,711,830 | $5,348,854 | 88% |
| December 31, 1995 | --- | --- | $7,087,313 | --- |

(P. 275; 534; 535; 565; 567; 568; 569; 570; 571; 581; 593; 594; 740; 741; 742; 743; 744; 745; 746; 747; 748; 749; 750; 751; 777).

The evidence reflected ongoing slippage in the trade payables, at the critical times, compared with other short term liabilities:

| Date | Total Payables | Trade Payables | Percentages | Exhibit |
|---|---|---|---|---|
| May 1994 | $ 9,695,146 | $ 2,744,232 | 28% | P. 209 |
| | $ 9,696,146 | $ 4,792,463 | 49% | P. 210 |
| December 1994 | $11,697,278 | $ 3,645,675 | 31% | P. 209 |
| | $11,697,278 | $ 8,140,448 | 69% | P. 210 |
| November 1995 | $14,470,602 | $11,271,348 | 77% | P. 210 |

Another account payable report, dated February 25, 1994, reflects total outstanding accounts at $1,154,495 (P. 247). As of March 31, 1994, VASI's Income Statement, for the preceeding 9–month period, showed a net loss of $585,686 (P. 739). After the Bernstein stock purchase was signed on June 29, 1994, certain additional disclosures were made, including the notation that "a number of vendors are due monies for over 30 days, over 60 days, or 120 days" (NLH–280, para. 33).

Brenda Mattausch was a job cost and cash management accountant for VASI. Between January and July 1994, she testified that one of her duties was to assist in deciding which bills VASI should pay.

She also reported, on a daily basis, the company's immediate cash position to the owners. According to Ms. Mattausch, VASI "never had a handle on what the liability was," and referred to the day-to-day company needs as a "chaos of payables." She testified that, in January 1994, VASI "was not current by any means in paying its vendors," and was on C.O.D. with many. This condition continued through at least July 1994. Similarly, VASI was behind on billing its accounts receivables. All the while, the company's accounting personnel were attempting to install a new accounting computer system, but were always struggling to input and catch up. The accounting system was never fully implemented. And. prior to July, 1993, VASI did not even have an accounting department (depo. of Jan Ghoman, at 17), and only began installation of its MAS 90 accounting program in January 1994 (Ghoman depo. at 37). Nor were the bank accounts reconciled or balanced. Instead, the owners were concerned only with current and daily balances, with what had to be urgently paid in order to keep flying, and "the float."

Similarly, the plaintiff's expert, Michael Cox, testified that his review of available VASI financial records supported the conclusion that between July 1, 1993 and June 30, 1994, VASI was not paying its debts as they became due (P. 175).

It is therefore the court's conclusion that VASI was not paying its bills in accordance with normal business terms, and that such facts show that they were not being paid as they become due.

Therefore, the plaintiff has met his burden of proof on the second required element of *Ariz.Rev.Stat.* § 44–1005, that of "insolvency."

In considering whether 9 Lives is entitled to a setoff, and may retain a lien for the amounts paid to GECAS to acquire the 308 and 4501 aircraft, the court must consider the "good faith" of 9 Lives. 11 U.S.C. § 548(c) and *Ariz.Rev.Stat.* § 44–1008(D); *In re Agricultural Research & Technology Group, Inc.*, 916 F.2d 528, 535 (9th Cir.1990). The court finds that good faith existed, and to rule otherwise would unfairly penalize 9 Lives. The May 10, 1994 assignment was disclosed to David Bernstein, who was perceived to be about to contribute new financial stability to VASI. Bernstein did not object to the assignment. With the expected GECAS restructuring, VASI's financial wherewithal was expected by all concerned to improve. At the time, the consideration was perceived to be adequate, even though in hindsight it has turned out to be inadequate. In addition, in May 1994, it was not entirely clear to any of the participants as to what VASI's financial condition actually was. For these reasons, the court finds that the transfers, although legally constituting fraudulent transfers, were made in good faith, and that 9 Lives is entitled to a setoff or lien to the extent of the payoffs paid to GECAS. The court finds such value to be $889,101.50.

### The Expert Witnesses—Insolvency

The trustee's expert, Michael B. Cox of Price Waterhouse, testified and submitted written reports wherein he concluded, after reviewing VASI's available financial records, that VASI was insolvent "from at least April 30, 1994" until it filed for bankruptcy relief on January 29, 1996. As part of this conclusion. Mr. Cox opined that VASI's debts exceeded the fair value of its assets, and that it was unable to pay its debts as they became due (P. 175). Supplemental Reports by Mr. Cox were identified as Ex. P. 208 and P. 754. Mr. Cox also rendered a number of legal conclusions relative to legal issues, which the court has disregarded, as such issues are beyond Mr. Cox's expertise.

Nine Lives called Richard W. Smith, and William J. Michiels of Putnam, Hayes and Bartlett, as experts on certain financial and valuation issues. Both experts, predictably, disagreed with Mr. Cox on perti-

nent conclusions. (See, NLH–201, 202, 203, 204, 321, 322).

After reviewing the reports and listening to the testimony of these experts, the court concludes that Mr. Cox's analysis of VASI's insolvent financial condition is better reasoned and more closely comports with this court's independent review of the evidence in this case. Cox's conclusions bolster this court's findings and conclusions on the insolvency issue. They will therefore be accepted.

On the other hand, Mr. Michiels' "hindsight" efforts to give value to the FAA certificate, rotable parts, aircraft interiors, good will and a tax refund were, for the most part, speculative, and inconsistent with VASI's own contemporaneous reports. The court also questions Mr. Michiels' expertise on valuation issues. Therefore, Mr. Michiels' conclusions are rejected, because they are not as consistent with the extrinsic evidence as the conclusions of Mr. Cox.

### B. The Nordam Transaction

■ The court, however, disagrees that the "Nordam Transaction" was an alleged usurpation by 9 Lives of a "corporate opportunity" available to VASI. Due to VASI's precarious financial condition as of the time the Nordam agreement was signed with 9 Lives on March 15, 1996, and because VASI had already filed chapter 11, VASI was unable to accept Nordam's proposal, even had it wished to do so (P. 142), Clark and Cole, by then, had been gone from VASI management since December 6, 1995 (P. 198, 200, 138), and had given up their remaining 35% stock interest to Bernstein (P. 138; SF). Although the Nordam matter had been percolating and under discussion since October 9, 1995 (P. 140, 451), and into November 1995 (NLH–91, 312), and December 1995 (P. 559), the transaction was not ultimately consummated until March 15, 1996 (P. 141, 142).

Although VASI's David Bernstein testified that he was aware of the Nordam proposal as early as mid-September when Clark showed him a fax, the evidence showed that, at that time, VASI was simply too financially weak to have accepted the proposal. VASI toppled into bankruptcy only a few months thereafter, on January 24, 1996, and clearly, after that point. VASI could not take advantage of the opportunity. On this point, the trustee's principal witness. David Bernstein, stated that although he was aware of the Nordam proposal as early as September, he knew the proposal was coming at a "difficult cash time" for VASI. Bernstein also testified that accepting the Nordam proposal then "would have been disadvantageous" to VASI, because "it would have been difficult to give up" potential profits that a "more advanced" plane could be earning while the Nordam tests were being conducted, and which would keep the plane out of earning circulation. Because, at that time, "every dollar was a pressure dollar," Bernstein candidly conceded that "If we had to do the identical transaction, it would have been difficult."

In sum, David Bernstein admitted that VASI was simply unable to exploit this opportunity even if it had desired to do so. Consequently, the trustee was unable to prove that 9 Lives, Clark or Cole conspired illegally to cause VASI a "loss of a corporate opportunity." All appropriate personnel at VASI were aware of the Nordam proposal at critical times. VASI had the opportunity—in effect the right of first refusal—to accept the Nordam proposal but elected not to do so; 9 Lives then accepted the proposal after VASI had already filed bankruptcy. VASI was not injured by any action undertaken by 9 Lives, Clark or Cole. The plaintiff is estopped by VASI's own actions from contending otherwise.

Judgment will be entered for the defendants on this claim.

### C. Nine Lives' Defenses

■ Defendant 9 Lives has raised numerous defenses to counts 1, 2, 3 and 6. Each was noted in the Joint Pretrial State-

ment (pages 11–14), and each will be addressed, lest an argument be made that the court did not consider them. Thus, those legal defenses raised by 9 Lives are addressed *seriatum:*

**(1) The Trustee did not establish the elements of Ariz.Rev.Stat. § 1004.**

The court agrees, and has so found.

**(2) The Trustee did not establish the elements of Ariz.Rev.Stat. § 1005.**

As noted above, the trustee did prove the elements of insolvency (both balance sheet and "equitable"), and lack of a reasonably equivalent consideration. The court thus considered, and rejects, 9 Lives' defense that plaintiff failed to meet his burden of proof.

**(3) The Trustee is only entitled to a money judgment, not a return of the property.**

The court disagrees. *Ariz.Rev.Stat.* § 44–1007(A) provides, among other things, for injunctive relief against further disposition, and "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." *See, Ollason v. Glasscock,* 26 Ariz. 193, 224 P. 284 (1924). Similarly, bankruptcy law remedies allow for a return of the property. 11 U.S.C. § 550(a).; *Acequia,* 34 F.3d at 809 (the extent to which the trustee may exercise state-law avoidance powers is governed, in turn, by § 550(a)).

**(4) The Trustee is not entitled to relief under § 548 of the Bankruptcy Code.**

The court disagrees. That Section allows a "reach-back" period of only one year from the date of the order for relief. 11 *U.S.C.* § 548(b). Here, one of the challenged transfers, which began on May 10, 1994 was completed November 22, 1995. Since bankruptcy was filed on January 24, 1996, the elements of § 548 were met as to the 4501 aircraft.

**(5) The Trustee has failed to assert a claim upon which this court can grant relief.**

The court disagrees. As noted above, a proper cause of action was asserted and proven under *Ariz.Rev.Stat.* § 44–1005 and 11 *U.S.C.* § 548. Jurisdiction was appropriate and the action timely filed. *Ariz.Rev.Stat.* § 12–543 and 11 *U.S.C.* § 108.

**(6) The Trustee's negligence caused its damages in whole or in part.**

The court disagrees. Negligence is not an enumerated defense to a statutory fraudulent conveyance action. *Ariz.Rev. Stat.* § 44–1008. Neither is it an includable "supplementary provision." *Ariz. Rev.Stat.* § 44–1010. In addition, case law does not support the general application of negligence as a *defense* to a fraudulent conveyance action. *See Huennekens v. Walker (In re Southern Int'l Co., L.P.),* 165 B.R. 815, 818 (Bankr.E.D.Va.1994) (in action by trustee to recover fraudulent transfers, the defendant filed a counterclaim for damages due to trustee's negligence which defendant alleged caused his liability on a guarantee for which he received repayment by the debtor). "A counterclaim is not a defense which goes to the justice of the [plaintiff's] claim; it is an affirmative action which claims damages for an independent wrong." *Cf. Granmo v. Superior Court,* 122 Ariz. 510, 512, 596 P.2d 36, 38 (App.1979) (In pre-judgment provisional remedy, counterclaims are inappropriate defenses). Having failed to assert a counterclaim, Viscount's negligence defense is legally ineffectual. Even if it were a defense, the court is aware of no evidence or fact which would support such a claim.

**(7) The Trustee's damages were caused in whole or in part by third parties over whom defendants had no control.**

No proof was adduced, nor argued in post-trial briefing, as to whom such third

parties might be, or how they "caused" damages which would somehow exonerate the transferee, 9 Lives, from the responsibility to return or pay for the two aircraft.

***(8) Defendant 9 Lives is excused from performance under the terms of the contracts giving rise to the transfers complained of, as the Trustee failed to perform its obligations constituting consideration under the terms of those contracts.***

Nine Lives' defense is simply inapplicable to this case. If 9 Lives desires to have the court reconsider this case as one of contract, and stipulates to a post-trial amendment of the complaint, it should file a pleading stating that it elects to also proceed under contract theories, and the court will then decide if the plaintiff's case theories should be enlarged. In that event, an award of attorneys' fees to the prevailing party would, of course, be an additional appropriate remedy. *Ariz.Rev.Stat.* § 12–341.01; *Holiday Mobile Home Resorts v. Wood (In re Holiday Mobile Home Resorts),* 803 F.2d 977, 979 (9th Cir. 1986).

***(9) The statute of limitations set forth in section 548 of the United States Bankruptcy Code bars the Trustee's claim as to the May 10, 1994 and December 29, 1994 transfers.***

The court agrees as to the action for recovery, of the 308 airplane. The assignment date of May 10, 1994 and transfer date of December 29, 1994 are beyond the one-year reach-back allowed from January 26, 1996. 11 *U.S.C.* § 548. But, as to that plane, the plaintiff prevailed under Arizona's fraudulent transfer statutes.

***(10) Viscount was solvent on the dates of the transfers, and did not become insolvent as a result of the transfers.***

The court disagrees. As set forth above, Viscount was insolvent under

both tests on May 10, 1994, December 29, 1994 and November 22, 1995.

***(11) Viscount received reasonably equivalent value for the transfers.***

The court disagrees. Thirty-eight (38%) percent of a property's value is not adequate or reasonably equivalent value, even if, *arguendo.* VASI received that consideration, which it did not. *See, e.g., United Energy Corp.,* 944 F.2d at 595; *Durrett,* 621 F.2d at 203. Moreover, GECAS received the payoff funds, not VASI. 9 Lives never made a single payment to GECAS on *any* unreimbursed lease payment, nor to TAHI for any rent payment. These "guarantees" and assurances were the principal purported consideration. They were woefully inadequate as "consideration," if not wholly illusory. "A conveyance made for consideration of nominal or no monetary value leaves the debtor in a much weakened financial position which hinders [its] creditors." *Scholes v. African Enterprise, Inc.,* 854 F.Supp. 1315, 1328 (N.D.Ill.1994), *aff'd sub nom. Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995).

***(12) Viscount's capital was unaffected by the transfers, and the May 10, 1994 transfer improved Viscount's capital position.***

This defense is inapplicable, because the causes of action prevailed upon by the trustee. *Ariz.Rev.Stat.* § 44–1005 and *U.S.C.* § 548, do not concern themselves with capital positions, but only solvency and reasonably equivalent value.

***(13) Defendant 9 Lives is entitled to a lien against the aircraft and to retain the transferred interest under section 548 of the Bankruptcy Code and under Arizona law as it gave value to Viscount for the transfers.***

The court agrees that, under both federal and Arizona law, 9 Lives is entitled to

a lien for the amount of value contributed to the assets. Here, the court finds such value to have been in the sum of $889,101.50. *Ariz.Rev.Stat.* § 44–1008(D); § 548(c). The court finds such setoff to be appropriate because the assignment and transfer to 9 Lives, even though found to be fraudulent transfers, were made in good faith.

*(14) This court lack jurisdiction over the transfers that occurred after May 10, 1994 because the transfers were so perfected that a bona fide purchaser from Viscount could not acquire an interest in the aircraft that is superior to the interest of defendant 9 Lives.*

The court disagrees. The court can grant judgment against "the first transferee" regardless of any subsequent transfers. *Ariz.Rev.Stat.* § 44–1008(B)(1). Furthermore, the trustee's right to recover the property from an initial transferee is absolute. *Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.),* 127 F.3d 1195, 1197–98 (9th Cir.1997). In any event, 9 Lives is still the owner, and there was no evidence that the two aircraft had been sold or transferred by 9 Lives. In fact, this court's temporary restraining orders of August 29 and September 9, 1996, and a later preliminary injunction entered January 23, 1997, prohibited any such transfers. (See, Dkt. No. 93). At all times since, 9 Lives has insisted that no such transfers have occurred. The court presumes that 9 Lives would not intentionally mislead the court on this point. *See* F.R.Civ.P. 11.

*(15) Viscount's conduct in making the transfers and acting upon them for twenty-one months estops it from asserting claims of fraudulent transfer.*

The court disagrees. A bankruptcy trustee is allowed a maximum of two years after the order for relief within which to bring an avoidance action. 11 U.S.C. § 546(a). The VASI bankruptcy was filed January 24, 1996. This adversary proceeding was commenced August 29, 1996. Thus, only seven (7) months intervened. This action is timely. No estoppel occurred, as a matter of either fact or law, which would constitute a defense in this case.

*(16) The property interests transferred to 9 Lives were not "assets" subject to the Arizona fraudulent transfer statutes to the extent they were encumbered by valid liens.*

The court disagrees. Merely because an asset is subject to a lien, or, as in this case, a lease which contains valid options to purchase, does not make a transfer of that interest immune from a fraudulent conveyance cause of action. *Ariz.Rev. Stat.* § 44–1006(1)(b). VASI was, because of the options, entitled to the status of an equitable owner. However, the statute recognizes that neither the transferor nor the transferee can gain any rights which are superior to those of valid lienholders or those with ownership interests. *Ariz.Rev.Stat.* § 44–1001(1)(a). ("Asset" does not include property to the extent it is encumbered by a valid lien. In other words, only the debtor's "interest" is subject to a creditor's fraudulent transfer claims). Whatever interest GECAS or FSBU may have had in the two planes evaporated when the options to purchase were exercised. VASI's unilateral option interests gave its creditors valuable rights which could be converted to cash.

*(17) The transfers made after May 10, 1994 were not transfers made or obligations incurred by a debtor under the Arizona fraudulent transfer statute.*

To the extent that the court understands this defense, it disagrees. The fraudulent conveyances to 9 Lives began with

the assignments of May 10, 1994 and concluded with the delivery of title on December 29, 1994 and November 22, 1995. The events of those days were an integrated transaction which combined to deprive creditors of valuable assets.

*(18)* **Arizona law does not apply to the transfers.**

The court disagrees. Arizona law applies to the 308 transaction. The court is unconvinced by argument to the contrary.

*(19)* **The transfers are not voidable under the Arizona statute as defendant 9 Lives took any property in good faith and for a reasonably equivalent value.**

The court agrees in part. Reasonably equivalent value was not given by 9 Lives to VASI. However, although good faith was present, it is irrelevant. The defense fails because it does not satisfy both elements of the statutory definition—good faith *and* reasonably equivalent value. *Ariz.Rev.Stat.* § 44–1008(A). In any event, the statute states that such a defense is only applicable to *Ariz. Rev.Stat.* § 44–1004(A). It does not apply to, nor is "good faith" mentioned in *Ariz.Rev.Stat.* § 44–1005, the statute and theory upon which the trustee has prevailed, as to the 308 aircraft. Good faith is a necessary element to authorize a setoff or lien, however.

*(20)* **The Trustee is entitled to recover judgment only to the extent of the value of the assets transferred, less any amounts spent by 9 Lives in acquiring, improving and maintaining the assets.**

The court agrees, but only to the extent of giving 9 Lives credit for the purchase prices finally paid to GECAS. Other claimed value was not sufficiently proven.

*(21)* **9 Lives as a good faith transferee is entitled to a lien on and a right to retain the interest transferred, as well as to enforcement of Viscount's obligations and a reduction of any judgment amount entered against it under § 44–1008(D) of the Arizona fraudulent transfer statute.**

The court partially agrees, noting that offset is also an allowed remedy. The court's judgment will so provide, creating a lien in favor of 9 Lives for the out-of-pocket purchase prices, only, spent by 9 Lives to acquire the 308 and 4501.

*(22)* **The transfers are not voidable under Arizona law to the extent they resulted from (a) termination of a lease on Viscount's property or (b) enforcement of a security interest.**

The defense raised is unclear, and to the extent the court understands it, such defense was either not proven, is inapplicable, is an erroneous legal conclusion, or is a misapprehension of applicable law.

*(23)* **The doctrine of laches bars the Trustee's claim.**

The court disagrees. While laches is a defense, *Ariz.Rev.Stat.* § 44–1010, no facts were shown which would establish it against the trustee.

*(24)* **Viscount waived its claims.**

The court disagrees, and the defendants have not explained what facts support this defense. However, a finding for 9 Lives on the Nordam transaction relied heavily on the concept of waiver.

*(25)* **Nevada law bars any creditors' claims that arose before the transfers.**

The court concludes that Nevada law is wholly inapplicable. Nor was it ever again mentioned, either at trial or in

post-trial briefing. The defense only appeared in the Joint Pretrial Statement.

**(26) 9 Lives was the equitable owner of the aircraft from the outset, and the aircraft were never part of, or intended to be part of, Viscount's assets.**

Although some evidence was introduced to show that, perhaps in the mind of GECAS, it may have felt that it was dealing with 9 Lives before the lease contracts were executed, such contracts were eventually signed with VASI. 9 Lives was not a party to either the 308 or 4501 lease contracts. As the lease contracts themselves state, the terms of the leases supercede any pre-execution negotiations and discussions, and take precedence over any oral agreements. (P. 11 at para. 20(1); P. 386 at para. 20(1)). In addition, Walter Cole executed the documents in his capacity as an officer (President) and authorized agent of VASI. Since Cole was also a principal of 9 Lives, if he had intended that 9 Lives be the lessee, he should have caused the contracts to be changed. The contracts speak for themselves and may not now be modified by parol evidence. The corporate officers, sophisticated enough to create an intricate network of affiliated corporations (and who argued that a multiplicity of such interlocking corporations are normal in the business world), cannot now seriously nor legitimately maintain that they were unaware of exactly what the contracts meant, nor who the parties to them were. The law prevents changing written contracts by hint, suggestion or oral testimony, when the terms relating to who are the parties to a contract are written in an unambiguous manner. *McCutchin v. SCA Serv.*, 147 Ariz. 234, 235, 709 P.2d 591, 592 (Ct.App.1985) (citing *Richards Development Co. v. Sligh*, 89 Ariz. 100, 358 P.2d 329 (1961)); *Rental Dev. Corp. v. Rubenstein Constr. Co.*, 96 Ariz. 133, 136, 393 P.2d 144, 146 (1964); *Ness v. Greater Ariz. Realty*, 117 Ariz. 357, 362–63, 572 P.2d 1195, 1200–01 (App.1977); *L.K. Comstock & Co. v. United Engineers & Constructors*, 880 F.2d 219, 224 (9th Cir.1989).

**(27) 9 Lives is entitled to offset its claim against Viscount that arose before the commencement of Viscount's bankruptcy.**

The evidence did not contain a 9 Lives "claim" against VASI. However, if it did, it would nevertheless *not* be an appropriate offset. There is a general rule followed by states which have adopted the Uniform Fraudulent Transfer Act that "even a fraudulent grantee is entitled to reimbursement of 'necessary expenditures in preserving the property.'" *Sanguinetti v. Strecker*, 94 Nev. 200, 210, 577 P.2d 404, 410–11 (1978) (quoting *Morris v. Hanssen*, 336 Mo. 169, 184, 78 S.W.2d 87, 95 (1934)). Therefore, the *only* allowable offsets permitted by statute are those which *directly* benefitted the transferred property. In addition, under the Bankruptcy Code, a setoff of an unrelated general claim in a fraudulent conveyance action is not an appropriate offset. The mutuality requirement is not met, and allowing such an offset would possibly result in a greater dividend to 9 Lives than to other creditors. *See Loo v. Martinson (In re Skywalkers, Inc.)*, 49 F.3d 546, 549 (9th Cir.1995) (transferee unable to retain preferential payments in satisfaction of unsecured claim); *Acequia*, 34 F.3d at 817; *United Energy Corp.*, 944 F.2d at 597 ("fraudulent conveyance cannot be offset against or exchanged for a general unsecured claim"); *Bustamante v. Johnson (In re McConnell)*, 934 F.2d 662, 667 (5th Cir.1991); *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 177, 182 (Bankr.S.D.N.Y.1998) ("it is well settled that a party will be unable to assert a setoff where that party is being sued for fraudulent transfers").

**(28) 9 Lives is entitled to offsets for amounts it paid for transfers of Viscount's interests in property, costs of improving and maintaining the property.**

Nine Lives will receive only an offset for the sums actually paid to GECAS in exercise of the purchase prices. Other 9 Lives' claims for "improvement" and "maintaining" the 308 and 4501 were, by the evidence, too ill-defined or too general to result in a tangible offset, or were illusory, non-existent, without adequate foundation, or simply failed of substantial. credible proof. (See, e.g., "Summary prepared by NLH"; NLH–334).

**(29) The interests transferred on December 29, 1994, were subject to 9 Lives's prior lien rights and right to retain that arise under § 44–1008(D) of the Arizona fraudulent transfer statute.**

The court disagrees. The challenged transfers, for which judgment is given, began on May 10, 1994, and concluded on December 29, 1994 and November 22, 1995. At those times, 9 Lives had no "prior lien rights," or if it did, such rights were either not proven, were unperfected, or are inferior to the rights granted to the trustee.

**(30) Redundant Defenses.**

The "Additional Claims and Defenses" found on pages 13–14 of the Joint Pretrial Statement are redundant and have been discussed fully in this section of the Memorandum Decision.

**D. Conclusion Re: Fraudulent Conveyance Claims (Counts 1, 2, 3 and 6)**

Plaintiff is entitled to a judgment for the value of the 308 and 4501 in the sum of $2.303,908.50, or a return of the property transferred (planes, engines, maintenance reserves and security deposits). Plaintiff has the option to elect which remedy it desires.

Defendant 9 Lives is entitled to an offset for the sums which it paid to clear the GECAS ownership interest, as follows:

| | | |
|---|---|---|
| 1. | 308 Payoff | $437,032.00 |
| 2. | 4501 Payoff | $452,069.50 |
| | | $889,101.50 |

The plaintiff may elect to have the property transferred back to the estate, without payment of the offset amount to 9 Lives, in which event 9 Lives shall have a senior lien against the property for $889,101.50, together with accruing interest thereon, from the date of the re-transfer, at 10% per annum.

Alternatively, 9 Lives may, within 5 days of the entry of judgment by this court, pay the plaintiff $1,414,799.00 and retain the transferred property. This is calculated as follows:

| | |
|---|---|
| Due to Plaintiff: | $2,303,908.50 |
| Less: Amount due to Defendant 9 Lives: | (889,101.50) |
| Net amount due Plaintiff in order for 9 Lives to retain property and satisfy Judgment | $1,414,807.00 |

The return of the aircraft to VASI's trustee, however, shall not include the Nordam hushkit installed on the 308 aircraft. To do so would create a windfall for VASI. The hushkit shall remain the property of 9 Lives. Or, if the estate desires to purchase the Nordam hushkit and 9 Lives wishes to sell it, it must negotiate for the item, and pay fair market value therefor. 9 Lives, upon transfer of the property back to plaintiff, shall return the property in the same condition as it was on May 10, 1994, reasonable wear and tear excepted.

Plaintiff is hereby granted an equitable lien on the planes, maintenance reserves, engines, documents and logs, and related attendant property until the planes are returned or the judgment is satisfied by payment.

### E. Preference or Post–Petition Payments to Turbo Aire Holdings, Inc. ("TAHI") or BAE Aviation, Inc. (dba Tucson Aerospace) ("BAE") (Count 4)

#### 1. The Claim

The trustee has asserted that certain pre-petition and post-petition payments from Viscount to defendants Turbo Aire Holdings, Inc. ("TAHI") and Tucson Aerospace ("BAE") were either preferential transfers under § 547 of the Bankruptcy Code, or unauthorized post-petition transactions, and has sought recovery of the amounts of such transfers. The trustee has further asserted that the transfer of certain receivables of amounts due to Viscount by Viscount Air Tours, Inc. ("VATI"), to BAE are also preferential transfers under § 547 of the Bankruptcy Code, and has sought recovery of the amounts of the transfers. (P. 138).

The trustee has further alleged that certain post-petition offsets of amounts due to Viscount by VATI, against amounts Viscount purportedly owed BAE and TAHI, were unauthorized post-petition transfers under § 549 of the Bankruptcy Code. Prior to trial, plaintiff moved for summary judgment on the claims against TAHI and BAE. On April 29, 1998, the Bankruptcy Court granted partial summary judgment in favor of plaintiff and against TAHI in the amount of $25,000 for the pre-petition transfer and against BAE in the amount of $60,000 for post-petition transfers or offsets. The court also voided any post-petition agreements. The court ruled that additional transfers to TAHI and BAE might be recoverable, provided the amounts of those transfers could be proven at trial. (Joint Pretrial Statement at 5–6).

The burden of proof in a preference action is upon the trustee, to prove the case by a preponderance of the evidence. *In re Lee,* 179 B.R. 149, 155 (9th Cir. BAP 1995), *aff'd,* 108 F.3d 239 (9th Cir.1997). Similarly, the burden is on the trustee to prove that an unauthorized post-petition transaction caused harm to the estate. *See In re Mora,* 218 B.R. 71, 73 (9th Cir. BAP 1998) (trustee must show that property of the estate was transferred postpetition, and that the transfer was not authorized by the Code or bankruptcy court). *See also* 5 COLLIER ON BANKRUPTCY § 549.02 (15th ed.1998) (purpose of § 548 is to allow the trustee to avoid postpetition transfers which deplete the estate).

#### 2. The Facts

From at least June 30, 1993, BAE leased a portion of the real property, located at 1000 East Valencia, from TAHI. (NLH–224). The agreed rental was $15.000 per month (NLH–22a). On July 15, 1993, TAHI agreed to abate the rent by $12,500 per month for a 1–year period, so that BAE and VASI (which rented the balance of the space) could make needed improvements estimated to be in the range of $300,000 (P.4). BAE was an FAA-certified air service repair facility, and approximately 90% of its business was derived from work on VASI aircraft.

In late May, 1995, Cole, Clark and Bernstein were in the process of modifying the VASI Stock Purchase Agreement executed a year earlier (P. 498). One of the conditions in the agreed modification was that VATI (Viscount Air Tours, Inc.), an entity owned 100% by Clark, would become the outside sales arm for VASI. VATI operated under the name "Best Deal Vacations." By November, 1995, when relations between Clark, Cole and Bernstein were once again strained, VASI was contending that VATI owed it $442,924 (P. 169). At the same time, VASI acknowledged owing BAE $436,691 (P. 169).

On or about May 2, 1996, after VASI had been operating in chapter 11 for just over three months, a settlement was reached for $244,000 (P.10). As part of that settlement, a VATI receivable of between $442.925—527,051 was transferred to BAE. (See, pp. 263, 779.) The plaintiff seeks a money judgment for an amount

falling within this range (P. 779). However, in summary judgment proceedings, the court voided the agreement, ordering the return of the VATI receivable intact to VASI. It further ordered that, in order for the trustee to recover more than granted in the summary judgment, the trustee would be required to prove what amounts were *paid* to BAE or TAHI.

In order to properly understand what it is that plaintiff seeks from either TAHI or BAE, and the defenses, it is helpful to set forth, verbatim, the defendants' contentions, articulated in the Joint Pretrial Statement:

> The Fourth Claim for Relief seeks judgment against Turbo Aire and [BAE] Tucson Aerospace for certain pre-petition transactions and transfers and for certain post-petition transactions and transfers. On April 29, 1998, the Court granted, in part, the Motions for Summary Judgment filed by the plaintiff against these defendants. The Court ruled that the $25,000.00 pre-petition payment by Viscount to Turbo Aire on January 3, 1996, was an impermissible preference and granted summary judgment for the plaintiff avoiding that transfer under 11 U.S.C. § 547. (Memorandum Decision, 10:1–22.) The Court further ruled that the December 6, 1995, pre-petition agreement between Viscount and [BAE] Tucson Aerospace "shall be deemed void" and granted summary judgment for the plaintiff on that issue. (Memorandum Decision, 12:7–11.) In so ruling, the Court held that any "amounts *paid* to Tucson Aerospace ... in satisfaction of this debt constitute avoidable preferential transfers ..."; and ruled that "[t]he amount of any such *payments* shall be determined at trial." (Memorandum Decision, 12:12–15 [emphasis supplied].) Therefore, the *only* issues for trial on the pre-petition transfer allegations are, first, whether Turbo Aire received any *payment* other than the $25,000.00 it was paid on January 3, 1996, and sec-

ond, whether [BAE] Tucson Aerospace received any *payments* as a result of the December 6, 1995, agreement with Viscount. These defendants contend that they did not receive any other payments from VATI. [BAE] Tucson Aerospace further contends that the plaintiff is not entitled to a money judgment against it for the purported [BAE] "Tucson Aerospace Offset." The plaintiff seems to contend that it is entitled to a money judgment against [BAE] Tucson Aerospace for the $527,051.39 VATI account receivable from Viscount that was transferred to [BAE] Tucson Aerospace to be applied to Viscount's debt to [BAE] Tucson Aerospace. The transfer of that account receivable has been avoided by the Court and the plaintiff is only entitled to recover judgment for any portion of that receivable that was actually *paid* to [BAE] Tucson Aerospace.

> The Court also ruled that the May 2, 1996 Agreement for Adjustment of Business Relationships was an unauthorized post-petition transaction and granted summary judgment in favor of the plaintiff for the $60,000.00 in payments paid by VATI. (Memorandum Decision, 13:19–26.) The Court reserved for trial the issue of whether VATI made any other payments to these defendants pursuant to the May 2, 1996 Agreement. (Memorandum Decision, 13:26 to 14:3.) This is the only issue left for trial on the plaintiff's post-petition allegations. These defendants contend that they did not receive any other payments from VATI.

In other words, as to the transfer of the VATI account receivable, it is BAE's contention that the attempted transfer has now been avoided, and that the entire VATI receivable (to the extent it is found to be owed), still and once more belongs to VASI and is available for liquidation by VASI's trustee.

BAE has filed a claim against VASI for $1,618,772.67, for services performed, and as far as the court can tell, this claim

includes no offset for any VATI receivable (P. 221). It was filed March 29, 1996. The proof of claim states that "the amount of all payments on this claim has been credited and deducted for the ... purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor" (P. 221). The invoices and summaries attached to the claim do not make any mention of any deductions for any VATI receivable. The described services relate only to actual work performed for repairs to VASI planes or property (P. 221). Nor, since summary judgment was entered, has BAE filed an amended claim, increasing it by the returned VATI receivable. This indicates that neither the VATI receivable, nor any amounts other than what was awarded in the summary judgment phase, was ever received or credited against BAE's debt.

### 3. Conclusion (Count 4)

After reviewing the evidence, the court can find no evidence which would support an additional monetary judgment against TAHI or BAE, other than the actual payments discussed in the Summary Judgment Memorandum Decision, which together total $85,000. The plaintiff has failed to prove that any other payments were made.[8]

Therefore, other than the judgment for $25,000 against TAHI, and the judgment for $60,000 against BAE, no other avoidable preferences or transfers were shown to exist upon which the court could grant additional relief. Therefore, no further relief shall be awarded to plaintiff other than the relief granted by the summary judgment. The court also declines to reconsider its partial summary judgment order, as requested by the defendants.

### F. Breach of Fiduciary Duties (Count 5)

In Count 5, the plaintiff seeks a judgment against Clark and Cole, jointly and severally, for several separate actions or events, which the plaintiff contends caused injury to VASI at a time when Clark and Cole were officers and/or directors of VASI. Together, the plaintiff construes and labels the cause of action as a "breach of fiduciary duties." Judgment will be entered for Clark and Cole on Court 5. Each of the plaintiff's separate contentions will be discussed in turn.

### 1. Formation of LorAir

The formation of a competitor airline, "LorAir," constitutes one of the plaintiff's generalized claims which alleges "breach of fiduciary duties" by Clark and Cole.

On or about April 4, 1995, the evidence suggests that Cole and Clark had an attorney friend. Bruce McCaslin and his wife, Loretta, "front" a start-up airline to compete with VASI (P. 307, 308). It was contemplated that LorAir would lease one of 9 Lives' two planes (P. 296). McCaslin had no previous experience owning or operating air carriers. The company was granted a Certificate of Convenience and Necessity by the FAA on November 17, 1995 (P. 307, 308). Shortly thereafter, on February 7, 1996, McCaslin sold 100% of the stock in LorAir to Walter and Dennese Cole for $25,000, and on July 23, 1997, LorAir received FAA approval to operate.

Even if the formation of LorAir might have been construed as a sinister move by 9 Lives, and/or Cole and Clark, in an effort to undermine VASI and its creditors, all parties acknowledged at trial that such a fact caused no damage to VASI, because VASI had ceased operating almost a year earlier, on October 28, 1996 (SF No. 25). Similarly, these facts do not even rise to the level of a breach of contract for a violation of the "non-compete" section of the Bernstein stock purchase agreement (See, Ex. 137), because, on May 22, 1995, such non-compete provisions of the earlier agreement were waived (P. 498). The court pointed out these legal shortcomings

8. Any issues raised by plaintiff relating to discovery sanctions, if any, are irrelevant to whether plaintiff has met his burden on the theories set forth in the Complaint.

to the parties at trial, and declined the plaintiff's proffered admission of numerous documents related to LorAir on the same grounds as stated here. Therefore, no cause of action was proven as to any aspect of the events leading up to, and after, the formation of LorAir.

■ Because LorAir never competed operationally with VASI, and was granted an operating certificate *after* VASI had closed its doors and had begun the process of liquidation, there was no competition, and therefore no damage. In summary, the Court feels that this LorAir contention is too vague. To the extent such vagueness was overcome, the evidence was simply insufficient to establish a breach of fiduciary duties as those allegations relate to the formation of LorAir. Judgment shall be entered in favor of Mssrs. Clark and Cole on this aspect of Count 5 of plaintiff's Complaint.

### 2. The Nordam Transaction

■ The plaintiff seeks to have judgment entered against Clark and Cole because an opportunity to install a Nordam hushkit was allegedly "diverted" from VASI to 9 Lives. As set forth above (Memorandum Decision at 37–38), VASI was unwilling and financially unable to take advantage of this opportunity. VASI knowingly and voluntarily passed on the opportunity. The creditors were thus deprived of nothing. Therefore, the court finds and concludes that no breach of fiduciary duty occurred relative to the Nordam hushkit transaction. Judgment shall be entered in favor of Mssrs. Clark and Cole on this aspect of Count 5 of plaintiff's Complaint.

### 3. Additional Debts incurred between May 22 and December 6, 1995

■ The plaintiff's attempt to place the blame for an increase in VASI's operating debt at the feet of Clark and Cole is misplaced. (See, chart of increased payables, P. 761). Clark and Cole resumed active roles in VASI when it became evident that Bernstein was accelerating or precipitating any decline in VASI's operations and finances. They came back into management in an effort to try to avert disaster, not to loot the company for their own benefit. Although it became quickly evident once the Bernstein agreement was signed on June 29, 1994, that Cole, Clark and Bernstein had differences of opinion on issues of management philosophy, the trustee introduced no evidence which showed that Clark and Cole deliberately attempted to sabotage the company which they had started, and at which they had worked so long to build up. In effect, intentionally doing so, as the trustee suggests, would have thwarted their own economic best interests, since they had lucrative consulting and employment contracts, and were still owed money by Bernstein under the Stock Purchase Agreement. No evidence suggests that Clark and Cole were so motivated, nor that they desired to see unsuspecting creditors harmed. Even Bernstein testified that although the trio had "normal" disagreements, that Clark and Cole wanted the company to succeed and "to see the company do great." James Linnan echoed that sentiment.

To the contrary, when they once more became active in VASI, Clark and Cole did so only to attempt to avert the company's accelerating nose-dive, and to bring the company back to a stable and economically viable business. However, rapid expansion, poor financial controls, escalating costs, and inadequate cash flow and capitalization combined to eventually doom the company. Those events were put in motion long before Clark and Cole stepped back into active management on May 22, 1995. To suggest that Cole and Clark are somehow individually liable for the company's continuing tumble, or that they personally caused harm to creditors between June–December, 1995, distorts the economic realities and facts of this case, and blows out of proportion their post-May 1995 involvement in VASI's affairs. Judgment shall therefore be entered in favor of

Mssrs. Clark and Cole on this aspect of plaintiff's Complaint.

### 4. Participation in the Fraudulent Conveyances of the 308 and 4501

As the court has ruled in plaintiff's favor on Counts 1, 2, 3, and 6, and will order return of the property wrongfully transferred, or payment of monetary damages by 9 Lives, it is unnecessary to consider plaintiff's claim that somehow Cole and Clark should be held individually liable. In other words, plaintiff's claim against the individuals is moot. The remedy granted against 9 Lives is sufficient. This aspect of plaintiff's Complaint will be dismissed, and judgment shall be entered in favor of Clark and Cole with regard to this theory.

### 5. Excess Rental Paid on the Valencia Property

This issue was tangentially raised in the Joint Pretrial Statement but only actually presented, for the first time, in the Post–Trial briefing stage. Moreover, because plaintiff failed to place any competent evidence in the trial record on this issue, he failed to carry his burden of proof. No affirmative evidence was presented at trial which would indicate that the increase in rent was not a true market rate at the time of the lease extension. Therefore, to the extent a claim was properly raised, it fails for lack of appropriate proof. Judgment for Clark and Cole will be entered on this aspect of plaintiff's Complaint.

### 6. Excessive Salaries and Perks

██ The same statements can be made of this allegation as said of the Valencia rent, above. If these issues were raised, the court finds that the salaries and perks were neither unreasonable nor excessive, because the responsibilities and stresses which accompany the operation of an air carrier involving passengers requires fair payment to those in senior management who undertake them. Such a business is highly competitive; the salaries and perks were earned, fair and reasonable. In addition, the court notes that David Bernstein

received the same compensation, although his experience had not previously involved the transportation of human lives. The trustee has not challenged his compensation. Nor did the trustee present any affirmative evidence from which the court could conclude that Cole and Clark's salaries and perks were unreasonable. No cause of action was proven. Judgment will be entered for Clark and Cole.

### 7. The TAHI, BAE and VATI Receivable

Because the court has directed that no further judgment against BAE and TAHI can be had, any claim against the individuals is moot. Moreover, this issue was not raised in the Joint Pretrial Statement, nor in a motion to conform the pleadings to the evidence, and it has therefore been waived. Clark and Cole shall have judgment entered in their favor on this theory.

### 8. Punitive Damages

Because the trustee has not prevailed on the merits of any of his sub-theories for "breach of fiduciary responsibilities," punitive damages against these individual defendants is not appropriate.

### 9. Conclusion (Count 5)

Plaintiff failed to carry his burden of proof that he is entitled to any type of exemplary or actual damages against Clark and Cole under Count 5. Judgment will be entered for the defendants.

### SUMMARY OF DECISION

| | |
|---|---|
| *Counts 1, 2, 3, and 6* | Judgment for plaintiff against 9 Lives for money damages of $2,303,908.50 or a return of the aircraft in acceptable return condition. Offset allowed to 9 Lives for $889,101.50. Net monetary judgment for plaintiff of $1,414,-807, if planes not returned in acceptable return condition. Nordam hushkit remains with 9 Lives. Liens granted to secure judgment and offset rights. |
| *Count 4* | Other than $85,000 previously awarded at summary judgment stage, no further judgment against BAE Aviation or Turbo Aire. |
| *Count 5* | Judgment for defendants Clark and Cole. |

*DIRECTIVE*

Counsel for plaintiff shall lodge an appropriate form of judgment consistent with this Memorandum Decision within 20 days. Any objections to the form of judgment shall be filed within 10 days thereafter. Any post-judgment motions shall be confined to those prescribed by the Rules of Bankruptcy Procedure (in other words, the Rules do not contemplate "Motions for Reconsideration" wherein the facts and law are once more debated).

Once post-judgment pleadings are filed, the court may rule on them without further argument, and final judgment will be rendered.

If the court has not yet ruled on any outstanding motion, it would be appreciated if the parties could so advise the court. In that way, all loose ends relating to this adversary proceeding may be appropriately concluded.

Finally, the court appreciates the effort put into this case by all sides, and the professional way in which the case's issues were presented. This includes the hard work not only of the attorneys, but of all those working behind the scenes as well—the secretaries, paralegals, other attorneys, computer technicians, photocopiers and runners. All clients' interests were fully represented to the best extent possible.